PEPPERS REFINING CO. et al. v. CORPORATION COMMISSION.

No. 32543. April 23, 1947.

*179 P. 2d 899.*

Robinson, Shipp & Robertson, of Oklahoma City, for plaintiff in error Peppers Refining Company.

J. B. Dudley, of Oklahoma City, for plaintiff in error Stephens Petroleum Company.

Floyd Green and Charles F. White, both of Oklahoma City, for defendant in error Corporation Commission of Oklahoma.

BAYLESS, J. Peppers Refining Company and Stephens Petroleum Company have appealed from an order of the Corporation Commission entered in February, 1946, establishing the daily oil allowables for the State of Oklahoma for the month of March, 1946. Since passage of the 1933 proration act the commission has held monthly hearings to fix the amount of production for the entire state from each of the various pools for the succeeding month. In addition to giving the statutory notice, the conservation officer, on February 7, 1946, advised all producers and purchasers by letter that in view of the rapid increase in crude storage and gasoline stocks, a cutback in the allowable production would be advisable. At that time there were approximately 50 purchasers who bought crude oil in the state, but only about 20 were present at the hearing. Thirteen of these purchasers testified that they would purchase as much oil in March as they had in February. Nine letters and telegrams urging the commission to follow the estimate of the Bureau of Mines were introduced in evidence. One of the letters stated:

". . . It is imperative, in order to prevent waste, that production be limited to a consumptive market demand. Nominations of purchasers are not indicative of consumptive market demand."

The conservation officer introduced in evidence, without objection, two telegrams from the Bureau of Mines, the first dated February 19, 1946, and the second dated February 25, 1946. The first telegram stated, ". . . forecast of demand for Oklahoma crude oil in March is three hundred sixty thousand barrels daily." The second telegram stated, ". . . Oklahoma crude stocks were 34,750,000 barrels on February 9 compared with 32,143,000 barrels on September 1, 1945. Total national crude stocks were 223,303,000 barrels on February 9 and 215,169,000 barrels on September 1 . . . ." Walter T. Pound, conservation officer, whose qualifications as an expert on oil production were admitted, testified that there had been an abnormal increase in the stocks of crude oil and gasoline; that crude oil stocks throughout the nation had increased approximately 8,000,000 barrels since September 1, 1945; that crude stocks of Oklahoma origin have increased about 2,500,000 barrels during that period; that gasoline stocks have increased from 78,000,000 to over 105,000,000, which is the highest they have ever been except during the war when the army acquired a large stock-pile of gasoline; that according to American Petroleum Institute figures the gasoline in storage is increasing at the rate of over 1,000,000 barrels a week, most of which increase has been during the past two months. He recommended that 164,525 barrels of oil be produced daily from the allocated or prorated pools and 195,000 barrels daily from the unallocated areas, making a total of 359,525 barrels daily production for the entire state, which is close to the Bureau of Mines' estimate of 360,000 barrels. Pound testified that if production was not reduced, he foresaw in the immediate future a complete shutdown of production as was once necessary in the state with all of the attendant ills that go with it and the destruction of many stripper wells, which would result in waste of oil and gas resources. For the Oklahoma City Wilcox pool he recommended a 20 per cent cutback for the month of March,

and for the Cement West-Medrano pool he recommended that the daily allowable per well be reduced from 300 to 100 barrels. The commission made a finding that the daily allowable of oil in Oklahoma for the month of March should be 359,525 barrels, which was a reduction of 28,475 barrels below the daily production allowable for the month of February. It also reduced the daily allowable for the Oklahoma City Wilcox pool and the Cement West-Medrano pool in the amount recommended by Mr. Pound.

Appellants contend, first, that the order reducing the daily allowable for the state is based entirely upon the telegram from the Bureau of Mines and that such evidence will not support an order of the commission determining the market demand; second, that "reasonable market demand" means the amount of oil which the purchasers are willing to buy from the producers in this state and not an amount determined by the Bureau of Mines or what the commission thinks should be reasonable for them to purchase; and third, that the commission arbitrarily reduced the allowables of the Oklahoma City Wilcox pool and the Cement West-Medrano pool without the use of any equitable formula and that there was no evidence taken at the hearing to sustain such reductions.

Although the commission makes monthly revisions of its proration orders and the questions regarding the particular orders involved herein are now moot, yet we think the rule announced in Van De Vegt v. Board of Commissioners of Larimer County, 98 Colo. 161, 55 P. 2d 703, controls herein. In that case the court held:

". . . A case is not moot where interests of a public character are asserted under conditions that may be immediately repeated, merely because the time for a particular order has expired. Southern Pac. Terminal Co. v. Interstate Commerce Commission, 219 U. S. 498, 31 S. Ct. 279, 55 L. Ed. 310. The problem here is of prime public concern and a continuing one. We are not warranted in relegating the parties to

the condition which would result from withholding determination."

See, also, Dove v. Oglesby, 114 Okla. 144, 244 P. 798.

The following statutory provisions under Title 52 O. S. 1941 are here applicable.

Section 85 defines waste to include, in addition to its ordinary meaning, economic, underground, or surface waste, and *waste incident to the production of oil in excess of transportation or marketing facilities or reasonable market demands;* prohibits production under conditions constituting waste; and *empowers the Corporation Commission to make rules, regulations, and orders for the prevention of such waste.*

Whenever full production from any common source can only be obtained under conditions constituting waste, one having the right to produce oil from such source may take only such proportion of all that may be produced therefrom without waste as the production of his wells bears to the total. (Sec. 87.)

The commission is authorized to regulate the taking of oil so as to prevent the inequitable or unfair taking from a common source of supply by any person and to prevent unreasonable discrimination in favor of one source as against another. (Sec. 274.)

Gauges are to be taken from time to time for the purpose of determining total production of the common source and the amount of oil which the operators of the wells are entitled to take. (Sec. 89.)

In a proceeding to ascertain the reasonable market demand or the transportation or marketing facilities for oil that may be produced from a common source of supply during a specific period of time, the commission may receive in evidence therein letters or telegrams from purchasers of oil which shall state the amount of oil produced from said common source of supply that such purchaser will purchase during the period

of time involved or the capacity of his transportation or marketing facilities which will be available for production from such common source during such period. (Sec. 110.)

All orders, rules, and regulations of the commission shall be regarded as prima facie, valid, reasonable, and just. (Sec. 111.)

The Interstate Compact, set out at section 204, provides in part as follows:

Article II. "The purpose of this *compact* is to conserve oil and gas by the prevention of physical *waste thereof from any cause.*" (Emphasis ours.)

Article V. "It is not the purpose of this compact to authorize the states joining herein to limit the production of oil or gas for the purpose of stabilizing or fixing the price thereof, or create or perpetuate monopoly, or to promote regimentation, but is limited to the purpose of conserving oil and gas preventing the avoidable waste thereof within reasonable limitations."

The commission takes the position that the term "reasonable market demands," as used in section 85, supra, means the reasonable consumptive demand, i.e., the amount of oil that the industry needs to carry on its day to day operations, together with a sufficient amount of working stocks to be stored above ground. Section 110, supra, is indicative of the meaning of this phrase. It authorizes the admission in evidence of telegrams and letters from purchasers of oil at market demand hearings, "which shall state the amount of oil produced from said common source . . . that such purchaser . . . contemplates or intends he or it will purchase during the period of time involved."

In Wilcox Oil & Gas Co. v. Walker, 168 Okla. 355, 32 P. 2d 1044, we held that the commission was required to determine the market demand for each separate common source of supply and that it was without power to deal with the various common sources as a unit.

It seems clear to us that "reasonable

market demands" as the term is used in these statutory provisions means the amount of oil the purchasers will buy regardless of how much the industry actually needs and irrespective of the reasonable consumptive demand of this state or of the nation. That is the interpretation placed upon these words by the court in Corporation Commission v. Champlin Refining Co., 286 U. S. 210, 76 L. Ed. 1063, wherein it said, at page 1076:

"The same pipelines and purchasers did not serve or take oil from all the pools, and in some the reasonable market demand was greater in proportion to potential production than in others."

Section 85, though twice amended, is substantially the same as the original enactment of 1915. It is a matter of historical knowledge that production at that time from the Cushing and Healdton fields far exceeded transportation and marketing facilities. Favorable pipeline connections allowed some producers to market their oil while others without a market stored it wastefully in earthen pits. It seems apparent that in order to remedy this evil the provision, "waste incident to the production of oil in excess of transportation or . . . reasonable market demands," was incorporated in the original proration law. The consumptive demands of the nation and its relation to conservation of oil had not entered into the picture at that time.

However, under the provisions of sections 85 and 87, supra, the commission is given broad and sweeping powers to make rules, regulations, and orders for the prevention of waste. In Gilmer Oil Co. v. Corporation Commission, 177 Okla. 505, 61 P. 2d 22, we held, page 24:

"The primary intent and purpose of the act as a whole is to provide for the conservation of oil and gas. By sections 2 and 3 of the act, the commission is vested with broad powers, and is charged with the duty of making rules, regulations, and orders for the prevention of waste."

See, also, Grison Oil Corp. v. Corporation Commission, 186 Okla. 548, 99 P. 2d 134.

The conservation officer testified that the crude oil and civilian gasoline stockpile were the highest they had ever been to his knowledge and that the gasoline in storage was increasing at the rate of over 1,000,000 barrels a week; that he could foresee a complete shutdown of all production with destruction of many stripper wells if production was not materially reduced, and that physical waste would follow such shutdown. The commission, in the performance of its duty to prevent waste, is not limited in the exercise of this power to a day to day or month to month basis. If, from the evidence produced at such a hearing, it may be reasonably foreseen that waste will likely result in the near future as a result of excessive production, the commission has the power and authority to restrict such production, and it may consider, among other things, the reasonable consumptive demand and the amount of crude oil and gasoline then in storage.

Throughout all the law governing petroleum production there runs this twofold problem: A very large potential production must be restricted in order to avoid physical waste of the commodity, yet the total known domestic supply is adequate for a comparatively few years' demand. To meet this situation the Legislatures of the various states have developed a regulatory mechanism which involves a measure of co-operation between state and federal governments. The federal government has established a fact-finding service, carried on by the Bureau of Mines, which estimates the consumptive demand for gasoline, fuel oil, and other products, and equates that composite demand for finished products back to crude production. This process is capable of a high degree of accuracy. The service was established in 1933 and the commission states that the forecasts made by this board have never been less than 98 per cent accurate. These forecasts through**out the nation have been** remarkably

accurate. (See article by Northcutt Ely, 51 Harvard Law Review, page 1215.)

As a result of the flood of overproduction in 1930-32, occasioned by the discovery of the East Texas field in which production mounted from nothing in 1930 to over 1,000,000 barrels a day in 1931, it became necessary to shut down production in Texas and Oklahoma. Again in 1939 there was an abnormal overproduction of oil in Oklahoma and other states, notably Illinois, which resulted in the shutting down of all production in this state. Waste of mineral resources resulted from each of these shutdowns. Oklahoma, together with all other principal oil producing states except California, has entered into an interstate oil compact for the purpose of conserving oil and gas and preventing waste. There is no commitment to place the Bureau of Mines' recommendations in effect locally, although the compacting states generally have done so within reasonable limits. See article by Ely, supra, page 1216. The fact that excessive production of oil in one state upsets the balance among the oil-producing states, causing a disastrous effect upon production in all of the states, illustrates the complexity of the problem, and while no state is bound to co-operate, they have generally done so to their mutual advantage. In the few notable exceptions where they have failed to co-operate in limiting production to reasonable consumptive demands, there has been excessive production with the consequent shutting down of all production and the resulting waste of natural resources.

The telegrams from the Bureau of Mines were supported by other evidence. We hold that the order was proper and that it was supported by substantial evidence.

The order recites that the commission has considered each common source of supply as a separate and distinct unit in determining the amount of oil that can be produced therefrom without waste and finds that during the month of March, 1946, there can be produced from each of the allocated common sources "the amount hereafter set out," which, together with the unallocated areas, will amount to 359,525 barrels of oil per day; that such production will tend to increase the ultimate recovery of oil and to prevent waste. This part of the order is supported by the testimony of the conservation officer who testified as to the amount of oil that could be produced from each allocated common source without waste during the month. In Wilcox Oil & Gas Co. v. Walker, supra, we held that there must be, as to each common source, a separate finding that total production therefrom will result in waste before the commission can enter a valid order limiting production from such source. There was such a finding in the case at bar, supported by competent evidence. In the absence of objection on the part of interested parties, ordinarily it is not necessary for the conservation officer to give evidence concerning each separate source of supply in greater detail than was done at this hearing. In Grison Oil Corp. v. Corporation Commission, supra, in paragraph 3 of the syllabus, we stated:

"An expert witness who gives his opinion based upon personal experience and observation, need not, as a prerequisite, detail the facts upon which such opinion is based, when such facts are voluminous and complicated; however, complete inquiry concerning such facts is permissible on cross-examination."

The Corporation Commission is presumed to have a good working knowledge of the oil pools in this state. When a new pool is brought in, a hearing is had before the commission to determine the potential of the field, how much oil can be produced without waste, and other information of a like nature. The commission is also kept advised of such matters by the monthly hearings. It is, therefore, unnecessary to present evidence to this board with the same particularity required in a court of law. In Chicago, R. I. & P. Ry. Co. v. State,

126 Okla. 48, 258 P. 874, we said, pp. 877-8:

". . . It is within the province of the Corporation Commission to pass upon the wisdom of the proposed undertaking by a public utility. That commission is presumed to be peculiarly experienced and fitted for that purpose, and, having seen and heard the witnesses, and being in possession of data and information not obtainable by this court. . . ."

The following apt quotation is from the case of Hanna Furnace Corporation v. United States, 53 F. Sup. 351, at page 344:

". . . The Supreme Court, in Rochester Tel. Corp. v. United States, 307 U. S. 125, 59 S. Ct. 754, 761, 83 L. Ed. 1147, . . . said: 'Recognition of the commission's expertise also led this court not to bind the commission to common law evidentiary and procedural fetters in enforcing basic procedural safeguards.' . . . In view of the investigations made by the commission in the matters of concern here, the 'knowledge of conditions, of environment and of transportation relations' so acquired has additional weight."

Production from the Oklahoma City Wilcox pool was reduced 20 per cent for the month of March. The Cement West-Medrano pool was cut from 7,300 barrels during February with an allowable of 300 barrels per well daily to 2,200 barrels in March with an allowable of 100 barrels per day per well, the cut in the per well allowable being 66 2/3 per cent. The average reduction for the allocated pools for the entire state was 15 per cent.

Mr. Pound recommended more severe restrictions upon some of the pools because they have produced for a longer period of time and the operators have had opportunity to get back their investments. 52 O. S. 1941 § 274 provides there must be no unreasonable discrimination in favor of one source of supply as against another.

Mr. Dudley, an official of the Stephens Petroleum Company, stated that the 300 barrels per well allowable for the Cement West-Medrano pool had been authorized after an extended hearing before the commission in which a great deal of engineering information concerning this pool had been presented, and if given a little time he could present expert evidence to show that it would be detrimental to the pool to cut the production by such a large amount.

We hold that the Oklahoma City Wilcox pool was not unreasonably discriminated against by reason of the 20 per cent reduction although the average reduction throughout the state was 15 per cent. On the other hand, the drastic reduction of the Cement West-Medrano pool was arbitrary, discriminatory, and in violation of section 274, supra, and was therefore erroneous. The only evidence to support this order was that of Mr. Pound that production from that pool should be reduced by that particular amount in order to prevent waste. In Grison Oil Corp. v. Corporation Commission, supra, we stated that private rights must yield to the application of the police power of the state to conserve our natural resources, but that "it is not contemplated that they will be annihilated thereby, or that they be interfered with to any greater extent than is reasonably required by a proper exercise of the power, taking into consideration the legitimate objects to be accomplished." The commission was not justified in applying an economic formula for the purpose of imposing restrictions upon production in one or all of the pools. Any rule or formula used by the commission substantially departing from percentage production must bear a reasonable relation either to the prevention of waste or the protection of correlative rights. Grison Oil Co. v. Corporation Commission, supra; Thompson v. Consolidated Gas Utilities, 300 U. S. 55, 81 L. Ed. 510.

It follows from what has been said that the commission did not err in entering the order complained of except as to the Cement West-Medrano pool.

HURST, C.J., DAVISON, V.C.J., and OSBORN, WELCH, CORN, and GIBSON, JJ., concur.