ANDERSON-PRICHARD OIL CORP. v.
CORPORATION COMMISSION et al.

No. 34283.    Oct. 2, 1951.

Rehearing Denied Oct. 23, 1951.
Application for Leave to File
Second Petition for Rehearing Denied Nov. 6, 1951.

*241 P. 2d 363.*

W. H. Brown, Paul G. Darrough, and Virgil R. Ball (of Brown, Darrough & Ball), Oklahoma City, for plaintiff in error.

Floyd Green and John Blanton, Oklahoma City, for defendant in error.

Ralph W. Garrett, Robert L. Imler, and George D. Almen, Jr., Tulsa, for defendant in error Sinclair Oil & Gas Company.

Jim Hatcher and Reford Bond, Jr., Chickasha, for defendant in error Little Nick Oil Company.

Albert G. Kulp, Paul Pinson, O. L. Lupardus, C. A. Kothe, and T. H. Eskridge, Tulsa, for defendant in error Oklahoma Natural Gas Company.

Y. P. Broome, Tulsa, for defendant in error Tidewater Associated Oil Company.

HALLEY, V. C. J. The Chickasha Gas Field is located in Grady county, Oklahoma. It has three distinct sands, or zones, from which it produces gas in commercial quantities. The deepest sand is called the Pooler zone, sometimes referred to as the Mona Sand, and above it are the Glover and Charlson zones. Production from each of these three zones may be had from a single well. Anderson-Prichard Oil Cor-

poration is the owner of a lease covering the SW/4 of sec. 27-5-8W, and on the date of the order here complained of it had completed its well, known as the Thomas No. 1, on the northeast ten acres of its 160 acres, into the Glover and Charlson zones, and had drilled this well into the Pooler zone, but had not completed it. The tests made indicated it would be a producer from the Pooler zone.

On October 30, 1947, the Corporation Commission of Oklahoma entered its order No. 20536, providing a formula for the allocation of gas production from the three producing zones above named. The express purpose of this order was to provide for ratable taking, to prevent waste, and to protect the interests of all parties concerned. This order provided for an acreage factor in the allocation formula, and that such acreage factor should be the number of "productive acres" assigned to each well in either or all three producing zones, or common sources of supply, in this field, and that no well should have an acreage factor in excess of 160 acres. Anderson-Prichard's Thomas No. 1 was not completed as a producer in the Pooler zone until September, 1948, when it was found to have a daily potential production of 23.4 MCF of gas.

Order No. 20536 fixed the acreage factor of Anderson-Prichard's Thomas No. 1 well at 57 acres, for the reason that the commission found that the western boundary of the Pooler zone included only 57 acres of the 160-acre lease of Anderson-Prichard, and under the allocation formula mentioned above only productive acres could be considered as an acreage factor. No wells had been drilled west of the Thomas No. 1 in that area to prove definitely the western boundary of the Pooler zone, and the Commission admitted that the western boundary line of the Pooler zone, as found and fixed by it, was a "compromise line", indicating a lack of certainty as to the exact location of the western limits of the zone in that area.

After its completion of Thomas No. 1 as a producer in the Pooler zone, Anderson-Prichard filed an application with the Corporation Commission, seeking to amend Order No. 20536 in such manner as to give Anderson-Prichard as an acreage factor its entire lease of 160 acres, and thereafter amended its application seeking a change in the western boundary line of the Pooler zone so that it would extend far enough in a westerly direction to include all of the Anderson-Prichard lease of 160 acres. Such an order would have affected other producers by increasing their acreage factor in cases where it had been decreased, by fixing the western boundary of the zone to correspond with that of the other producing zones above it.

On June 17, 1949, the commission issued Order No. 22506, denying Anderson-Prichard's application, and leaving its acreage factor at 57, as fixed by Order No. 20536. This appeal is from Order No. 22506.

The authority of the commission to allocate the taking of gas from a common source of supply is found in section 239, 52 O.S. 1941, and is as follows:

"Whenever the full production from any common source of supply of natural gas in this state is in excess of the market demands, then any person, firm or corporation, having the right to drill into and produce gas from any such common source of supply, may take therefrom only such proportion of the natural gas that may be marketed without waste, as the natural flow of the well or wells owned or controlled by any such person, firm or corporation bears to the total natural flow of such common source of supply, having due regard to the acreage drained by each well, so as to prevent any such person, firm or corporation securing any unfair proportion of the gas therefrom; provided, that the Corporation Commission may by proper order permit the taking of a greater amount whenever it shall deem such taking reasonable or equitable. The said commission is authorized and directed to

prescribe rules and regulations for the determination of the natural flow of any such well or wells, and to regulate the taking of natural gas from any or all such common sources of supply within the state, so as to prevent waste, protect the interests of the public, and of all those having a right to produce therefrom, and to prevent unreasonable discrimination in favor of any one such common source of supply as against another."

It will be noted that the commission must determine the market demand for gas monthly from the field under consideration. The commission then apportions this production equitably and ratably between the various owners and producers in the field. One of the factors to be used in making such allocation is the "acreage factor." Hence, it is necessary for the commission to determine how many productive acres each producer has in the producing strata, in order to determine the amount of gas such producer is entitled to produce from each common source of supply.

In Republic Natural Gas Co. v. State, 198 Okla. 350, 180 P. 2d 1009, this court said:

"By 52 O.S. 1941 §239, the Corporation Commission is given the right to regulate the taking of natural gas from any common source of supply so as to protect the interests of all those having the right to produce therefrom."

Anderson-Prichard claims that the completion of its Thomas No. 1 well as a producer in the Pooler zone established for allocation purposes its entire 160-acre Thomas lease. The order of the commission did fix 160 acres as the maximum acreage factor to be used in allocating the amount of gas which each well was entitled to produce. No order had been made fixing the location of any well in this field. A lessee had the right to drill on any location he might select, and all operators had apparently exercised this right, since none of them had drilled in the center of a lease. If Anderson-Prichard had drilled other wells on its 160-acre lease,

its allowable production would not have been increased, because 160 acres had been fixed as the maximum acreage factor to be used in the allocation formula. Anderson-Prichard claims that since it owned a lease of 160 acres and drilled one producing well thereon, such well proved the productivity of the entire lease and gave the lessee an absolute right to use 160 acres as an acreage factor in the allocation formula to determine the amount of gas it was entitled to take from the field through this well.

We conclude that the foregoing statutory provisions vest in the Corporation Commission the authority to make its original Order No. 20536, and that the holding in the Republic Natural Gas Company case, above quoted from, is ample authority to support the claim that such power is statutory. We know of no authority which denies the right of the Corporation Commission to use an acreage factor in allocating the amount which a producer may produce from a particular well. It is not the only factor entering into the allocation formula. Pressure and potential productive capacity are also used in arriving at an allocation figure.

We have examined the authorities cited by Anderson-Prichard in support of its first proposition. They hold that where a lessee goes upon land, explores and discovers oil or gas in paying quantities, and reduces the same to possession, the lessee thereby becomes vested with "an estate therein as corporal property . . .", and "are entitled to be protected in the exercise of their rights according to the terms and conditions of their contract", as was said in Brennan v. Hunter (1918), 68 Okla. 112, 172 P. 49. The vested estate of the lessee is limited. Sec. 238, Title 52, O.S. 1941, enacted in 1915, as was sec. 239, above quoted, vests in the Corporation Commission authority "to require the conservation of said gas" at that early date. It provides that when gas is encountered in commercial quantities, it shall be confined in its original stratum

until it can be produced and utilized without waste. The estate vested in the lessee by production does not vest such rights as transcend the power of the commission to take such reasonable steps as it finds necessary to prevent waste and protect the correlative rights of all those who take from the common source of supply. It is true that the commission had fixed a maximum acreage factor of 160 acres in this field, but we think this acreage factor necessarily means productive acreage. Suppose a lessee has a lease on 640 acres and drills a productive well, and it is later proved that only half of the acreage covered by the lease is productive; it would be unjust to other producers in the lease area to permit the nonproductive acreage to be included in the acreage factor used in the allocation formula, where the maximum acreage would be fixed at 640 acres.

Since the term "acreage factor", as used in the order of the commission, is expressly fixed at and limited to "productive acreage", the decisive issue is whether or not the finding of the commission that only 57 acres of the Anderson-Prichard lease was productive was supported by substantial evidence. This question depends upon whether or not the commission had before it substantial evidence to support its finding that the western boundary of the Pooler zone was as fixed by the commission. The eastern portion of the Anderson-Prichard lease was admittedly productive and had been proved productive by the drilling of its well in the northeast corner of its lease, where it had a right to drill. The western boundary of the Pooler zone, under the Anderson-Prichard lease, was so fixed that only 57 acres of their 160-acre lease was within the productive area of the Pooler zone. Sec. 20 of art IX of the Constitution of Oklahoma, as amended by S.B. 61 of the 1941 Legislature, is as follows:

"The Supreme Court's review of appealable orders of the Corporation Commission shall be judicial only, and in all appeals involving an asserted violation of any right of the parties under the Constitution of the United States or the Constitution of the State of Oklahoma, the court shall exercise its own independent judgment as to both the law and the facts. In all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence. Upon review, the Supreme Court shall enter judgment, either affirming or reversing the order of the Commission appealed from."

It will be noted that the above section of our Constitution makes two provisions relative to the duty and power of this court in considering appeals from orders of the Corporation Commission. In those appeals involving an "asserted violation of any right of the parties" under either the State or the Federal Constitution, "the court shall exercise its own independent judgment as to both the law and the facts."

The Corporation Commission has cited the case of Pannell v. Farmers Union Co-operative Gin Ass'n, 192 Okla. 652, 138 P. 2d 817, in support of the rule that on appeals from orders of the Corporation Commission this court is required to review the evidence "and must sustain the order appealed from if it is supported by substantial evidence." The case of Peppers Refining Co. v. Corporation Commission, 198 Okla. 451, 179 P. 2d 899, and a number of other cases wherein the "substantial evidence" rule has been followed and approved, are cited. We find no fault with these decisions, but they are not within the first class of appeals mentioned in section 20, art. IX of the Constitution, above quoted, because they are not appeals from orders where the parties assert the violation of some constitutional right. They all appear to fall within the second class of cases covered by the clause, "In all other

appeals from orders of the Corporation Commission, the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence."

Anderson-Prichard here contends and asserts that the order of the commission appealed from is violative of its rights under both the Due Process Clause of the Oklahoma Constitution and the Fourteenth Amendment to the Constitution of the United States. We think it clear that whether the order appealed from falls within the first or the second category, it must be lawful and supported by competent and substantial evidence. "Substantial evidence" is defined in the Pannell case, supra, as follows:

" . . . substantial evidence means something more than a 'scintilla of evidence', and means evidence that possesses something of substance and of relevant consequence and such that carries with it fitness to induce conviction."

—quoting with approval from N.L.R.B. v. A. S. Abell Co., 4 Cir., 97 F. 2d 951, wherein it was said:

"Substantial evidence is evidence furnishing a substantial basis of fact from which the fact in issue can reasonably be inferred . . .",

and from N.L.R.B. v. Union Pacific Stages, 9 Cir., 99 F. 2d 153, as follows:

" . . . It implies a quality of proof which induces conviction and makes an impression on reason."

All of the evidence bearing upon the western productive limits or boundary of the Pooler zone in the Chickasha gas field consists of testimony of petroleum engineers and geologists. It was the testimony of expert witnesses, based upon training, experience, and study of similar fields and of this particular field. It was of a scientific nature. All agree that the only absolutely certain method of fixing the productive limits of a producing sand or zone located from 8,000 to 10,000 feet below the surface is the drilling of wells. Here no such wells had been drilled west of the Anderson-Prichard Thomas No. 1.

Section 86.1, 52 O.S. 1941, provides that the term "common source of supply" shall "include that area which is underlaid or which, from geological or other scientific data, or from drilling operations or other evidence, appears to be underlaid, by a common accumulation of oil or gas, or both. . . ." This clearly indicates that geological or other scientific data may be relied upon to determine the productive limits of a common source of supply. We assume that it will not be disputed that the commission has the power to define and fix the limits or boundaries of any common source of supply. The entire proration system, often upheld by this court, depends upon the power of the commission to determine what area constitutes a common source of supply.

We are unable to agree with the contention of Anderson-Prichard that the completion of one producing well in the northeast corner of their 160-acre lease proved the entire 160-acre lease productive, although the commission had fixed 160 acres as the maximum acreage factor in the allocation formula. The testimony of trained and experienced geologists and petroleum engineers is expert testimony, entitled to due consideration, especially where no well or wells have been drilled to disclose exactly the productive limits of a sand or zone located far beneath the surface.

Mr. A. H. Richards, District Geologist for Anderson-Prichard, testified that there was no certain way of determining the productive boundaries or limits of a pool, except by drilling. Portions of his testimony follow:

"Q. And until it is drilled out and tested there is no way of determining the line of any zone—that's right, isn't it? A. That is correct. * * *

"Q. Mr. Richards, I believe you testified that you have no knowledge, or that you have no idea how far west the productive limits of this field extend in the Pooler zone? Is that right? A. That's right.

"Q. If you had the job on the determination of the westerly productive boundary of the Pooler sand—if it was your job to determine the westerly productive boundaries of the Pooler sand, what factors would you take into consideration? A. I would turn that job over to the Engineering Department.

"Q. That's an engineer's job rather than your job? A. That's right. . . .

"Q. I believe you said, Mr. Richards, that in the absence of a nonproducing, a nonproducer being drilled in the Pooler zone, to the west of the Thomas well, that there is absolutely no basis on which to fix the western boundary of the Pooler zone—is that correct? A. That's correct. From the information that we now have there is absolutely no place to fix the west boundary of the Pooler zone.

"Q. Geologically speaking, that's the only basis to fix the productive boundaries of the Pooler zone? A. That's correct. . . .

"Q. To carry this over a point farther—in the absence of the sand being actually condemned by the drilling of a dry hole, is it your opinion that there is absolutely no basis for fixing any productive boundary at all, any, in any of these sands, with respect to this field? A. Not until it is proven nonproductive.

"Q. Then, in the absence of a nonproductive well, it should extend indefinitely on all sides? A. Until it is proven nonproductive. . . .

"Q. Mr. Richards, you are testifying as a geologist, are you not? A. Yes, sir.

"Q. And you say that the—you are saying now that the limits should be fixed with respect to the size of the lessee's lease, rather than on any geological basis—is that what you mean? A. Until proven such. If there was a dry hole there that would fix the boundary."

He testified as to the west half of the Anderson-Prichard 160-acre lease as follows:

"Q. Do you think the Pooler zone is productive in the west half? A. I sure do—that's my opinion—I have no proof of it.

"Q. But holding that opinion you would recommend the drilling of that well? A. If I thought the upper zone would help pay the bill—if I thought the upper zone would help pay part of the bill.

"Q. Then, on the basis of what you have just said, then you don't consider the Pooler zone to be productive in the west half? A. I didn't say that at all. I don't know.

"Q. Commercially? A. Well, I don't know. I don't want— I don't know whether it would be or not, but if it were not for the shallow zones in there. . . .

"Q. Well, you mean you wouldn't recommend it without the shallow zones to help pay it out? A. I would want them to help pay it out. That's a mighty expensive hole.

"Q. Yes, and you would want help from those other two zones? A. That's right. But I still say I think the west half would be productive."

Mr. Richards testified positively that he thought the limits of the productive area of the Pooler zone should include all of the Anderson-Prichard lease.

Mr. A. R. Greer, Petroleum Engineer for Anderson-Prichard, testified that the Pooler sand increases in thickness toward the west, and said:

"Q. And the thickness of the sand isn't material as to whether or not the sand is productive at all, is it; in other words, you could have a sand three hundred feet thick that would be nonproductive? A. Yes, it is possible.

"Q. Or twice as thick as the Thomas Number One? A. It is possible to have thick sand that is not productive—yes, sir. . . .

"Q. Then the boundaries you propose would not be based on geological or

678

engineering data but rather on lease boundaries, is that correct? A. Inasmuch as there is no geological or engineering data to support the presumption that the field runs out before it reaches the lease line, that is what we would do. . . .

"Q. Then you agree that there is a geological basis for fixing boundaries, and it doesn't necessarily take a dry hole to fix productive boundaries in a field? A. That is true."

Mr. R. M. Gawthrop (appearing in the record as "R. N. Gothrip"), Chief Geologist for Sinclair, testified that he was present at the original hearing before the Corporation Commission in Case CD-1463, and with other geologists and technical experts had submitted a map to the Corporation Commission showing the productive limits of the Pooler zone on the west side of the field. In his opinion, 57 to 60 acres of the Anderson-Prichard lease was productive in the Pooler zone. He testified as follows as to what factors he took into consideration in arriving at his conclusion as to where the western boundary line should be fixed:

"Well, then, I made one of those maps, that was presented to the Corporation Commission Engineer, and on that map I took into consideration the structure, the development, and drew what I thought was a fair representation of the probable productive acreage, and on that map I would give the Anderson-Prichard—and I also made up a schedule, the number of acres that would come within the line for each individual lease (indicating on map) and on the Anderson-Prichard lease I gave them 60 acres. I later measured it with a (planimeter) and I measured, and it measured 57 acres, not 157. . . .

"Q. He showed he thought that Exhibit 13 was his opinion of the limits of the lease and then he did that, and he drew a map, and I am now asking if he believed they coincided. A. I don't have any reason to change my opinion.

" . . .

"Q. Do you think that the present western limits of the Pooler sand is designated by Order 20536, or in your opinion? A. Yes, that's right.

"Q. Is there any physical factor to justify extending the boundary line to the west? A. None that I know.

" . . .

"Q. Is it necessary, in your opinion, to have a dry hole to determine the western boundary of this pool? A. If you had a dry hole a half a mile away, you still wouldn't know whether the productive sand stopped 200 feet away from the well or 200 feet away from the dry hole—so not knowing, you would probably split the difference—a dry hole wouldn't necessarily show the limits of the pool.

"Q. Is there in your opinion anything that has been brought out in the questions or testimony here today, which would in your opinion justify extending the western boundary? A. No—none."

Mr. A. B. Eley, District Geologist for Oklahoma Natural Gas Company, testified that he was familiar with the Chickasha gas field and had worked with the Chickasha gas field since 1940.

He testified as follows:

"Q. Have you studied the map which was issued by the Corporation Commission in Order No. 20536? A. I have.

"Q. Are you familiar with it in all respects? A. Yes.

"Q. Are you familiar with the field in question and the geological facts relating thereto? A. Yes, sir.

"Q. Now, will you answer the question I put just a moment ago, to which objection was made? A. Will you state it again?

"Q. In your opinion as a geologist, based upon your knowledge both of the field and of the map, do you believe that the lines drawn on this map, Exhibit 11, correctly reflect the productive limits of the Pooler sand zone? A. That's my opinion, that it's correct."

Mr. John Janovy, District Geologist for Tidewater Associated Oil Company, testified as follows:

"Q. Are you familiar with the area commonly known as the Chickasha gas field? A. Yes, sir.

"Q. And have you made a study of that field with regard to the Pooler sand zone? A. Yes, sir.

"Q. Have you made an independent study to determine the western boundary as you would draw it? A. I have.

"Q. What factors have you used to determine the western boundaries? A. We have no actual facts to determine the boundary on in geology but we use what facts we can determine from the study of an area. In this case, we have two known productive sands above the Pooler zone which we can establish definite boundaries on. In this case, the boundaries are approximately the same, so in the other sands below these two I have used the same boundaries.

"Q. Are there any physical facts to justify, in your opinion, extending the boundary farther to the west? A. Development.

"Q. Does Tidewater have any leases in this area? A. Yes.

"Q. Would Tidewater benefit by extending this boundary to the west? A. I believe they would.

"Q. Is it necessary, in your opinion, to have a dry hole to prove the field will not produce upon certain areas? A. No.

"Q. Is there anything, in your opinion, to show that this western part of the Anderson Prichard Thomas lease will produce? A. No."

It is interesting to note that the company employing Mr. Janovy owned some leases in the Chickasha field and, in his opinion, would benefit somewhat if the western boundary line of the Pooler zone were extended to cover all of the lease of Anderson-Prichard. The opinion of expert witnesses is generally accepted by the court as constituting substantial evidence. Grison Oil Corp. v. Corporation Commission, 186 Okla. 548, 99 P. 2d 134. The witnesses above mentioned had all had experience with this particular field and similar fields, and we conclude that their testimony constituted competent and substantial evidence to support the order of the commission fixing the western boundary line of the Pooler zone at a line which included only 57 acres of the Anderson-Prichard lease.

Anderson-Prichard contends that the order appealed from denies it due process of law and is in violation of that clause of the Constitution of the State of Oklahoma, and also of the Fourteenth Amendment to the Constitution of the United States. We have above quoted sec. 239, Title 52, O.S. 1941, under proposition 1, wherein it is made the duty of the Corporation Commission " . . . to regulate the taking of natural gas from any or all common sources of supply within the state, so as to prevent waste, protect the interests of the public, and of all those having the right to produce therefrom. . . ." In Patterson v. Stanolind Oil & Gas Co., 182 Okla. 155, 77 P. 2d 83, 305 U.S. 376, 83 L. Ed. 231, this court said, in the first syllabus:

"The police power of the state includes the protection of the correlative rights of owners in a common source of oil and gas supply, and this power may be exercised by regulating the drilling of wells into said common source of supply and distributing the production thereof among the owners of mineral rights in lands overlying said common source of supply as provided by chapter 59, Art. 1, S.L. 1935, without violating either sections 7, 15, or 23 of Article 2 of the Oklahoma Constitution, or section 10, article 1, and Section 1 of the Fourteenth Amendment to the United States Constitution."

The court in that case also mentioned Brown v. Humble Oil Refining Co., 126 Tex. 296, 83 S.W. 2d 935, 87 S.W. 2d 1069, 99 A.L.R. 1107, 101 A.L.R. 1393, which quoted with approval from Lombardo v. City of Dallas, 124 Tex. 1, 73 S.W. 2d 475, as follows.

"All property is held subject to the valid exercise of the police power, nor are regulations unconstitutional merely because they operate as a restraint upon private rights of persons or property or will result in loss to individuals. The infliction of such loss is not a deprivation of property without due proc-

ess of law; the exertion of the police power upon subjects lying within its scope, in a proper and lawful manner, is due process of law."

In Russell v. Walker, 160 Okla. 145, 15 P. 2d 114, this court said in the first syllabus:

"Under the police power of the state, the Legislature may regulate and restrict the use and enjoyment of landowners of the natural resources of the state, such as oil and gas, so as to protect them from waste, and prevent the infringement of the rights of others. Such legislation does not infringe the constitutional inhibitions against taking of property without due process of law, denial of the equal protection of the laws, or taking property without just compensation."

In 2 Constitutional Limitations (8th Ed.) pages 1319-1320, it is said:

"The Legislature may also regulate and restrict the use and enjoyment of landowners of the natural resources of the state such as subterranean waters, gas, oil, and timber, so as to protect them from waste and prevent the infringement of the rights of others. Such legislation does not infringe the constitutional inhibitions against the taking of property without due process of law, denial of equal protection of the laws, or taking property without just compensation."

Section 86.4, 52 O.S. 1941, provides that the Corporation Commission may make orders, rules, and regulations applicable to each common source of supply, and may make general orders, rules, and regulations applicable alike to all common sources of supply in the state. We think that the erroneous contention of Anderson-Prichard that the completion of its Thomas No. 1 well proved the entire 160 acres productive is based upon the fact that 160 acres was fixed as the maximum acreage factor for this field; but this maximum acreage is only to be used where it is found that the entire 160 acres is productive. It would be unjust to allow 160 as an acreage factor in the allocation formula if only a portion of such acreage were shown to be productive. The portion of their acreage held nonproductive may yet be included in the acreage factor, should further development to the west prove that it is productive.

Since the above-quoted section of our State Constitution provides that on appeals from orders of the Corporation Commission asserting violation of constitutional rights, this court is authorized to exercise its own independent judgment as to the law and the facts, we have concluded that the order appealed from is lawful, is supported by competent and substantial evidence, and does not deprive Anderson-Prichard of any constitutional right; and the order of the commission is therefore affirmed.

WELCH, CORN, GIBSON, JOHNSON, and BINGAMAN, JJ., concur. DAVISON and O'NEAL, JJ., dissent.