Application of Elwin BENNETT for an Order Deleting the SE/4, NE/4 of Section 18, Township 28 North, Range 8 West, Grant County, Oklahoma, From Order No. 33,875, Attributing Acreage to the Bennett No. 1 Well in the NW/4 SW/4 NE/4 of said Section 18.

Sam K. VIERSEN and Sam K. Viersen, Jr., dba Viersen & Cochran, Plaintiffs in Error,

v.

Elwin BENNETT, Defendant in Error.

No. 38617.

Supreme Court of Oklahoma.

April 19, 1960.

Rehearing Denied June 21, 1960.

Smith, Inglish & Gray, By Morris G. Gray, Okmulgee, for plaintiffs in error.

Harry C. Marberry, Oklahoma City, for defendant in error.

BERRY, Justice.

On November 8, 1955, the Corporation Commission, hereafter referred to as "Commission" promulgated an order (No. 31,025) embracing that portion of Cherokee and Grant Counties, Oklahoma, from which it was then believed that oil and gas would be produced from the Cherokee Sand. By said order 40-acre drilling and spacing units for the production of oil or gas were provided for. The order also provided a formula for use in determining whether a well was a gas well or an oil well; fixed the amount of oil or gas that could be produced from a 40-acre drilling unit and provided in substance that an increased allowable for a gas well would be granted under certain conditions in "the ratio that area of the voluntarily unitized or consolidated tract bears to 40 acres". After test wells had indicated that the Cherokee Sand underlying the land in controversy (NE/4, Sec. 18, T. 28N, R. 8W, Grant County) herein referred to as the "Bennett Tract", and land in the vicinity of said land, was productive of oil and gas, the Commission on December 27, 1955, promulgated a further order (No. 31,296), which in effect made the first referred-to order applicable to said lands.

In 1956 Sam K. Viersen and Sam K. Viersen, Jr., hereafter referred to as "protestants", completed a gas well on the SW/4 of the Bennett Tract. This well is known as the Bennett No. 1. Following completion of the well, protestants filed an application with the Commission in which they asserted in substance that the Bennett Tract would produce only gas and for said reason that in fixing the amount of gas that could be produced from the well, the acreage factor should be considered as 160 acres; that they should therefore be permitted to produce 4 times as much gas as that allotted to a 40-acre drilling unit. Elwin Bennett, hereafter referred to as "Applicant" who owns approximately one half of the royalty under the Bennett Tract, filed a protest to protestant's application. His position was that the Cherokee Sand underlying the East half of the Bennett Tract would produce oil. Following a hearing on the application

and protest, the Commission, on December 31, 1956, promulgated an order (No. 33,875) granting protestants' application as to 120 acres (S/2 & NW/4 of NE/4) but denying the application as to 40 acres (NE/4 of NE/4). The effect of the Commission's order was that the last referred-to 40 acres would probably produce oil. This order was not appealed from.

After the last above referred-to order was promulgated, the protestants, on February, 1957, completed an oil well in the NE/4 of the Bennett Tract. This well is known as the Bennett No. 2.

On July 11, 1958, applicant filed an application with the Commission wherein he sought deletion of the SE/4 of the Bennett Tract from the order last above referred to. The pertinent portion of the application is this:

"3. That information obtained, since the granting of said order, from the subsequent drilling of wells in the area indicates that there is now no doubt but that the SE/4 NE/4 of said Section 18, is underlain by oil and that a well drilled on this quarter quarter section will be an oil well; that Applicant wishes to delete the SE/4 NE/4 of said Section 18, from Order No. 33875 and to limit the acreage attribution by said order to the W/2 NE/4 of said Section 18."

The above referred-to application was referred to a referee for the purpose of taking testimony and reporting to the Commission. Following a rather extended hearing before the referee, the referee made extensive findings of fact. The finding directly in controversy is this:

"8. That taking into consideration all of the evidence, facts and circumstances in this cause, it appears from the preponderance of the evidence that there has been a substantial change in the knowledge of the conditions existing in the Cherokee Sand underlying the E/2 NE/4 of said Section 18 and that by the drilling of two oil wells offsetting the SE/4 NE/4 of said Sec-

tion 18 would not indicate that said quarter quarter section is underlain by oil producing Cherokee Sand, and therefore said quarter quarter section should be deleted from Order No. 33875, and from and after the date of the order of the Commission in this cause the Bennett No. 1 well located in the NW/4 SW/4 NE/4 of said Section 18 should be permitted to produce only two times the volume of natural gas which would void in the reservoir a space equivalent to that space voided by an oil well on 40 acres which produces the basic daily oil allowable with the maximum daily gas allowable; that in all other respects Order No. 33875 should remain in full force and effect.

"9. That in the interest of securing the greatest ultimate recovery of natural gas from the pool, the prevention of waste and the protection of correlative rights, this application should be granted in accordance with the above findings."

█ The findings of the referee were in effect accepted by the Commission and the SE/4 of the Bennett Tract was deleted from Order No. 33,875, and permissible gas production from the Bennett No. 1 well was fixed at two times that allowed a 40-acre drilling unit. The effect of this order was that the West half of the Bennett Tract was productive of gas and the East half was productive of oil. From said order protestants perfected this appeal.

Protestants contend in substance that an unappealed-from adjudication by the Commission relative to the acreage factor to be used in determining the amount of gas that may be produced from a gas well is res judicata and is not subject to being vacated or modified by the Commission; that in any event such an order can only be modified or vacated where a substantial change in conditions is shown and that such a showing was not made in the instant case.

The record shows that at the time the Commission considered protestants' application and applicant's protest thereto, no well had been drilled south of the N/2 of Sec. 13, T. 28N, R. 9W, nor the N/2 of Sec. 18, T. 28N, R. 8W. At the time the last application was considered 6 wells had been drilled to the south of said N/2 of Sections 13 and 18. All of said wells were completed as oil wells. One of the wells was drilled on the NW/4 of the SE/4 of Sec. 18, which means that same is a diagonal offset to the SE/4 of the Bennett Tract. At the time protestants' application was heard, therefore before the Bennett No. 1 was drilled, an oil well had been completed on the NW/4 of the NW/4 of Sec. 17. This well is a diagonal offset to the SE/4 of the Bennett Tract. A geologist testified that from his study of the area a well drilled on the SE/4 of the Bennett Tract would be an oil well within the formula provided in Order No. 31025 first herein referred to; that the oil wells completed on the NW/4 of SE/4 of Sec. 18 and the NW/4 of NW/4 of Sec. 17 were draining oil from under the SE/4 of the Bennett Tract. The referred-to evidence, in our opinion, forms an adequate basis for the Commission's finding that there was a substantial change in the conditions existing at the time the first application was considered and the conditions existing at the time the last application was considered. The issue presented by this appeal is therefore whether the Commission had jurisdiction and authority to modify its final Order No. 33,875 in the manner in which same was modified.

█ In our opinion it was within the province of the Commission to determine that a common source of supply of gas underlying certain portions of the area embraced by the orders heretofore referred to and that there was also a common source of supply of oil underlying other portions of said area. The Commission's action in this particular is in keeping with the facts and the provisions of 52 O.S.1951 § 81 et seq. The Commission was originally of the opinion that the common source of supply of gas under the Bennett Tract was 120 acres or the W/2 and the SE/4 of said tract. Subsequent drilling operations de-

veloped that the Commission had probably erred in not concluding in the first instance that the common source of supply of gas was limited to the W/2 of the Bennett Tract. In so erring, the Commission had probably entered an order permitting protestants to produce one-third more gas from the Bennett well than they were in fact entitled to produce. Did the Commission have jurisdiction and authority to correct this error by limiting the gas that protestants could take from the Bennett No. 1 well to the amount of gas attributable to two drilling 40-acre units? We are of the opinion that the posed question must be answered in the affirmative.

It is provided in 52 O.S.1951 § 86.3 that "The Commission shall have the authority to limit the production of gas from wells producing gas only to a percentage of the capacity of such wells to produce. The production of gas in the State of Oklahoma in such manner and under such conditions as to constitute waste as in this Act defined is hereby prohibited, and the Commission shall have authority and is charged with the duty to make rules, regulations, and orders for the prevention of such waste and for the protection of all fresh water strata and oil or gas bearing strata encountered in any well drilled for gas." It is provided in 52 O.S.1951 § 87.1 that whenever the production from any common source of supply of oil or gas can be obtained under conditions constituting waste or drainage not compensated by counter drainage, then one may take therefrom only such proportion of the oil or gas "as the productive capacity of the well or wells of any such person considered with the acreage properly assignable to each such well bears to the total productive capacities of the wells in such common source of supply considered with the acreage properly assignable to each well therein." 52 O.S. 1951 § 239 makes clear that in determining the amount of gas that may be taken from a well due regard must be given to the acreage drained by each well in order that no person shall take an unfair portion of the gas supply.

As we read the cited statutes the Commission was granted authority and it was in fact made its duty to limit the gas that may be produced from a common source of supply to an amount which represents the taker's fair share thereof; that in determining said share due consideration shall be given to the gas-productive acres assignable to each well that will take from the common source of supply and that drainage without compensation shall be avoided. In fact protestants do not contend otherwise. As pointed out, their principal contention is based upon the proposition that Order No. 33,875 is in fact res judicata and therefore serves to fix the gas allowable of the Bennett No. 1 at the amount of gas attributable to three 40-acre units irrespective of a substantial change in conditions in the area affected by the order. In the alternative, protestants contend that in any event the order is only subject to modification where a substantial change in conditions is showing and that such a showing was not made.

Upon oil or gas being discovered in an area, the Commission, in making orders such as Nos. 31,025, 31,296 and 33,875, must act on geological data which is then the best evidence available. The drill bit eventually proves or disproves said data. The sum and substance of protestants' position is that if the drill bit establishes that the geological data is faulty, the Commission is nevertheless bound by an order to the effect of No. 33,875. As we read the applicable statutes, the Legislature intended that the Commission conserve the supply of oil or gas in a field and protect the interest of all parties in said supply at all stages of the production. We are, therefore, of the opinion that the Legislature intended that the Commission conserve the supply of oil or gas in a field and protect the interests of all parties in said supply at all stages of the production. We are, therefore, of the opinion that the Legislature intended and contemplated that orders to the effect of Order No. 33,875 could and should be modified when it is shown that modification is necessary in order to conserve oil or,

gas or bring about a fair and equitable production of the oil or gas.

In Anderson-Prichard Oil Corp. v. Corporation Commission, 205 Okl. 672, 241 P.2d 363, 367, appeal dismissed 342 U. S. 938, 72 S.Ct. 562, 96 L.Ed. 698, a 160-acreage factor formula was used for allocating gas production from a field. Anderson-Prichard completed a gas well on a 160-acre lease that it owned. The Commission subsequently found and ordered that only 57 acres of this lease was productive and accordingly limited the amount of gas that could be taken from the Anderson-Prichard well. Anderson-Prichard perfected an appeal from said finding and order. In rejecting Anderson-Prichard's claim of error on the Commission's part, it was pointed out that "it is necessary for the Commission to determine how many productive acres each producer has in the producing strata in order to determine the amount of gas such producer is entitled to produce from each common source of supply." (This was the determination that the Commission made in the instant case). Further on in the Anderson-Prichard case this was said:

"* * * It is true that the Commission had fixed a maximum acreage factor of 160 acres in this field, but we think this acreage factor necessarily means productive acreage. Suppose a lessee has a lease on 640 acres and drills a productive well, and it is later proved that only half of the acreage covered by the lease is productive; it would be unjust to other producers in the lease area to permit the non-productive acreage to be included in the acreage factor used in the allocation formula, where the maximum acreage would be fixed at 640 acres.

*     *     *     *     *     *

"* * * We assume that it will not be disputed that the Commission has the power to define and fix the limits or boundaries of any common source of supply. The entire proration system, often upheld by this court, depends upon the power of the Commission to determine what area constitutes a common source of supply."

In the concluding portion of the Anderson-Prichard case this was said:

"Sec. 86.4, 52 O.S.1941, Supp.1949, provides that the Corporation Commission may make orders, rules, and regulations applicable to each common source of supply, and may make general orders, rules, and regulations applicable alike to all common sources of supply in the state. We think that the erroneous contention of Anderson-Prichard that the completion of its Thomas #1 well proved the entire 160 acres productive is based upon the fact that 160 acres was fixed as the maximum acreage factor for this field; but this maximum acreage is only to be used where it is found that the entire 160 acres is productive. It would be unjust to allow 160 as an acreage factor in the allocation formula if only a portion of such acreage were shown to be productive. The portion of their acreage held nonproductive may yet be included in the acreage factor, should further development to the west prove that it is productive."

After referring to legislation granting to the Commission power to make orders, rules and regulations in order to carry out the provisions of the Conservation Act, this Court in State ex rel. Huddleston v. Bond, 172 Okl. 415, 45 P.2d 712, 714, said that "The Legislature realized, no doubt, that conditions surrounding the production of oil from a common source of supply would change from time to time. To meet the exigencies of such changed condition, the commission was empowered by the quoted section of the act to exercise a discretion, judicial in nature, and to make and modify its orders, to accomplish the purposes of the act, that is, the prevention of waste and the permission to each producer to take his ratable part of the oil from the common source."

In Application of Peppers Refining Co., Okl., 272 P.2d 416, 424, this was said:

"* * * To hold that the Commission could never modify a well-spacing pattern established by a previous order not appealed from, upon a showing of characteristics about a common source of supply, and the withdrawals therefrom, that were not known or anticipated at the time of the original order, would 'tie the hands' of the Commission and often prevent it from performing its statutory duties under our Oil and Gas Conservation Act, Title 52 O.S.1951 § 81 et seq. * *"

After recognizing that it is probably good policy for the Commission to make initial conservation orders based upon geological data, it was pointed out in the last cited case that if the Commission, following development, "could not decrease the size of the spacing units or increase the density of the well locations, it might be powerless, not only to effectively prohibit inequities or encroachments as to correlative rights in a common reservoir, but also powerless to prohibit some of the various types of waste, and more particularly that which has been denominated in the above Act 'Underground Waste', leaving underground oil which any prudent operator would not hesitate to drill for, if permitted to do so."

In Delaney v. Osborn, Okl., 265 P.2d 481, 484, the Commission modified a prior order establishing the gas-oil ratio in a field. At the page indicated we said:

"(3) We find no merit in respondents' contention that the Commission was without authority to modify its previous order. This contention is based upon a fallacious conception that where the Commission has once acted, it is impotent to act again."

The parties have each referred to an article by Mr. Howard H. Harris appearing in Vol. II, Okla.Law Rev., pp. 123–148, which treats with the power and authority of the Commission to modify its orders pertaining to production from a common source of supply. In said article Mr. Harris cites and discusses a number of cases in which issues similar to the issues presented by this appeal were considered.

In their brief, protestants stress the provisions of 52 O.S.1951 §§ 111 and 112, to the effect that no collateral attack shall be allowed upon orders, rules and regulations of the Commission and that a person affected by any legislative or administrative order of the Commission shall have the right to apply for the modification of same.

As reflected by the definitions of the phrase collateral attack appearing at p. 809, § 408b, 49 C.J.S. Judgments, the phrase is not subject to precise definition. One of the definitions given in C.J.S. is that a collateral attack is "any proceeding which is not instituted for the express purpose of annulling, correcting, or modifying such decree". We are of the opinion that the Legislature in enacting Sec. 111, supra, did not intend that an application such as applicant filed be considered as a collateral attack on the order to which same was directed. To our way of thinking the Legislature in fact intended that when a change of conditions shows that an order of the Commission such as the order before us is erroneous, the order be corrected so as to effectuate the object and purpose of the Conservation Act, and since such is the intent of the Legislature the application before us must be considered as a direct attack on Order No. 33,875. We are of the further opinion that it is here unnecessary to determine whether the order last referred to was a legislative or administrative order within the purview of Sec. 112, supra. This statute does not by express terms prohibit modification of an order that may fall without the referred-to classification, and in our opinion precedent establishes the proposition that such an order may be modified following notice to the interested parties and a hearing. See In re Lovell-Crescent Field, Logan County, 198 Okl. 284, 178 P.2d 876. It is not here claimed that notice was not given interested parties or that such parties were denied the opportunity to fully present their contentions.

We are of the opinion that the order appealed from is supported by substantial evidence and that the Commission had power and authority to promulgate said order. See Mee v. Corporation Commission, Okl., 293 P.2d 593 and cited cases.

Affirmed.