**L. R. FRENCH, Jr., Appellee,**

v.

**CHAMPLIN EXPLORATION, INC., and Monsanto Company, Appellants.**

**No. 47541.**

Supreme Court of Oklahoma.

Jan. 21, 1975.

Rehearing Denied May 20, 1975.

Francis S. Irvine, Kerr, Davis, Irvine, Burbage & Green, Inc., Oklahoma City, for appellee.

C. Harold Thweatt, Crowe, Dunlevy, Thweatt, Swinford, Johnson, & Burdick, Oklahoma City, for appellants.

LAVENDER, Justice:

L. R. French, Jr., Appellee, (French) filed two separate applications before the Corporation Commission of the State of Oklahoma. French sought permission to drill an additional well on each of two separate spacing and drilling units heretofore established by order No. 97327, dated May 2, 1973. 640 acre units with one permitted well for the production of natural gas and natural gas condensate from the Hunton "B" formation was generally established for the Ames Field by that prior order. The applied for additional wells were to be located in the units described as Sec. 26 and 34, both in T21N, R10W. The two applications were consolidated without objection for hearing and order purposes. The evidence developed different facts and bases for modification as to each of the two units. Each unit was in a different common source of supply as to the Hunton "B" formation. The Corporation Commission in its order No. 104991, dated May 6, 1974, allowed the French application and permitted the two additional wells to be drilled under authority of 52 O.S.1971, § 87.1(c). That subsection provides:

"The Commission shall have jurisdiction upon the filing of a proper application therefor, and upon notice given as provided in subsection (a) above, to decrease the size of the well spacing units or to permit additional wells to be drilled within the established units, upon proper proof at such hearings that such modification or extension of the order establishing drilling or spacing units will prevent or assist in preventing the various types of wastes prohibited by statute, or any of said wastes, or will protect or assist in protecting the correlative rights of persons interested in said common source of supply, * * *."

Two of the protestants before the Commission, Champlin Exploration, Inc. and Monsanto Company (collectively called Champlin), appeal.

There is little conflict between the parties as to controlling principals of law. Each recognizes the "substantial evidence" rule. This court by syllabus in Pannell v. Farmers Union Cooperative Gin Ass'n, 192 Okl. 652, 138 P.2d 817 (1943) said:

"Under Art. IX sec. 20, constitution of Oklahoma, as amended by Senate Bill 61, S.L.1941, p. 544, on appeal from the corporation commission this court is required to review the evidence, and must sustain the order appealed from if it is supported by substantial evidence."

No distinction is made as to oil and gas conservation orders. This rule also controls appeals in that field. Peppers Refining Co. v. Corporation Commission, 198 Okl. 451, 179 P.2d 899 (1947).

Each party recognizes the "change of condition" rule. Wood Oil Co. v. Corporation Commission, 205 Okl. 534, 239 P.2d

1021 (1950) applied this rule to § 87.1(c), supra, stating in a syllabus by the Court:

"The Corporation Commission is without authority to entertain or grant an application to vacate, amend or modify a spacing and well drilling unit established by a former order of the Commission, which has become final, in the absence of a showing of a substantial change of condition in the area, since the former order was made or other change of factual situations specified in the statutes."

This rule is restated in Phillips Petroleum Co. v. Corporation Commission, Okl., 482 P.2d 607 (1971). There in the syllabus by the Court modification authority required "a substantial change of conditions or substantial change in knowledge of conditions existing in the area since the prior order was entered." That syllabus goes on to state:

"The phrase 'change in knowledge or conditions' encompasses an acquisition of additional or new data * * * which requires a re-evaluation of the geological opinion concerning the reservoir."

There is little conflict between the parties as to the existence of certain facts. In its order, the Commission found:

As to the application for an additional well in Sec. 26—

" * * *

"Data gained from further production in the area involved here establishes that the Detrick "B" No. 1 Well is producing in an area much less porous than was earlier estimated, resulting in a rapid decline in the capability of such well to produce, and such well is unable to adequately drain the recoverable hydrocarbons underlying Section 26; that the Bierig "A" Well in Section 25 has shown a rapid decline in production of gas, and a significant increase in the production of oil, indicating that it is changing to an oil well, and that the zone from which it is producing is much less porous than was earlier anticipated, and that it is not draining as large an area as was earlier anticipated; that the same common source of supply in Section 36 also appears less porous, as indicated by the fact that the Monsees No. 3 Well in Section 36 has changed to an oil well, and the State No. 36–1 Well in Section 36 has coned out and been plugged and abandoned; that such information indicates that the SE/4 of Section 26 instead of being pinched out of Hunton "B" production is underlain by a less porous Hunton "B" productive area, and that unless the applicant is permitted to drill a well in such SE/4 of Section 26, that the gas and other hydrocarbons underlying such quarter section will not be produced and saved.

" * * *

As to the application for an additional well in Sec. 34—

" * * *

"Data obtained from development and production indicates that the pinchout line was formerly thought to divide Section 3 from Section 34 as separate common sources of supply, but it has now been shown to be moved to the west and the productive areas in Sections 2 and 3, Township 20 North, Range 10 West, and Sections 34 and 35, Township 21 North, Range 10 West have now been shown to be a single common source of supply by the drilling of the Fisher No. 4 Well in the center of the SE/4 of Section 3, which encountered 30 feet of porosity, and is making about 8,000,000 cubic feet of gas per day and which well was drilled in what was formerly considered to be a truncated and unproductive area separating said Section 3 from Section 2 to the east and Section 34 to the north; that the Midwest Fisher No. 3 Well, located in the SE/4 NW/4 of Section 2, has changed from a low gas/oil ratio well to a high gas/oil ratio well, indicating that said well which was originally an oil well is converting to a gas well, and since it is bounded on the south by a tight formation, as shown by the Fisher No. 2 Well in the SW/4 SW/4 of Sec-

tion 2, and by water on the east and north, the only area from which this gas could be coming is from the expansion of the gas cap from the northwest and underlying Section 34; that such information indicates the SE/4 of Section 34 is underlain by the Hunton "B" Formation, and unless applicant is permitted to drill a well in such SE/4, the area will be substantially drained by the Allen No. 2 Well in the NW/4 NW/4 SW/4 of Section 35.

"  *    *    *."

Champlin in its argument agrees "the findings made by the Commission accurately recite the evidence   *   *   *." A review of the record substantiates this. Champlin's position argues the facts do not satisfy the two principals of "substantial evidence" and "change of condition or knowledge." We do not agree.

█ In the Commission's prior order, No. 97327, of May 2, 1973, the Ames Field, as to the Hunton "B" formation, was determined to contain several separate sources of common supply. It ordered one permitted gas well for each section (a 640 acre unit). Almost a year later the Commission's order, No. 104991 of May 6, 1974, modified this prior order permitting an additional well as to two units, Secs. 26 and 34. Was there substantial and additional knowledge to sustain this modification for the additional wells as authorized under 52 O.S.1971 § 87.1(c) for prevention of waste and protection of correlative rights? We hold there was.

The additional well for Sec. 26, to be located in the SE¼, is permitted to prevent waste. The order found the Hunton "B" formation under that unit to be less porous than first estimated. This same finding was made as to a different source of supply consisting of units immediately to the east and south of Sec. 26. These determinations are based on (1) reduction of gas production from the permitted well in Sec. 26 (Detrick "B" in the SW¼), (2) increased ratio of oil to gas in the next well to the east (Bierig "A"), (3) the water

coning, plugging and abandoning of well to the southeast (State), and (4) changing of gas well to oil well in that same southeasterly unit (Monsees No. 3). This new knowledge comes from the reaction of the field to production and depletion after the entering of the prior 1973 order.

The additional well for Sec. 34, to be located in the SE¼, is permitted to protect correlative right and offset drainage. The order now on appeal found a common source of supply as to units in the west half of Sec. 35, Sec. 34 (to the west of Sec. 35), Sec. 3 (south of Sec. 34) and Sec. 2 (east of Sec. 3). It placed the pinchout line farther west so as not to separate Sec. 34 and Sec. 3 and not place each in a separate common source of supply in the Hunton "B" formation as reflected in the prior 1973 order. This determination is based on (1) new development by the subsequent drilling of a gas producer in the center of the SE/4 Sec. 3 and finding 30 feet of porosity (Fisher No. 4), (2) indication of change of gas well to oil well in Sec. 2 (Midwest Fisher No. 3), (3) the area water bound as to the Hunton "B" formation on the north and east, and (4) prior knowledge of tight formation to the south (Fisher No. 3). Much of this is new knowledge derived from development and reaction of the field to production and depleting subsequent to the prior 1973 order. These facts allow a determination by the Commission order of a common source of supply instead of two separate sources for the sections involved. These facts allow a determination by the Commission order of the expansion of the gas cap from the northwest underlying Sec. 34 to the south and east. This supports substantial drainage of SE/4 of Sec. 34 by a well in Sec. 35. (Allen No. 2 located in the NW/4, NW/4, SW/5 Sec. 35).

At Corporation Commission hearing resulting in the prior 1973 order, Champlin maintained there was only one common source of supply of production in the Hunton "B" formation and not several as indicated by that prior order. At the instant hearing, Champlin's expert witness main-

tains this same stance. He finds no change of conditions subsequent to that prior order. This is contra to the testimony of the expert witness of French.

The Commission on additional knowledge gained from subsequent development, production and depletion now modifies its prior order on proof of prevention of waste in connection with the additional well in Sec. 26 and protection of correlative rights concerning the additional well allowed in Sec. 34. We find no lack of "substantial evidence" and no lack of "change of knowledge" necessary for us to reverse the Commission's order.

Affirmed.

All of the Justices concur.