L. O. WARD, Plaintiff in Error,

v.

CORPORATION COMMISSION of the State of Oklahoma, and Tenneco Oil Company, Defendants in Error.

No. 43715.

Supreme Court of Oklahoma.

June 9, 1970.

Paul Brown, of Brown, Verity & Brown, Oklahoma City, for plaintiff in error.

Barth P. Walker, of Walker & Watson, Oklaohma City, for defendants in error, Tenneco Oil Co.

BLACKBIRD, Justice.

This appeal involves the spacing of gas wells in an area of Township 20 North, Range 10 West, in Blaine and Major Counties.

The matter came before this State's Corporation Commission (hereinafter referred to merely as the "Commission") upon the Application of the plaintiff in error, hereinafter referred to as "Appellant" or by his surname of "Ward", and another Application filed in said Commission by the defendant in error, Tenneco Oil Company, hereinafter referred to as "Appellee" or "Tenneco".

The filing of these two Applications in the Commission was precipitated by Ward's drilling of a well, called his "Freed No. 1", into the Hunton Lime formation, on a tract described as the SW/4 NE/4 of Section 34, Township 20 North, Range 10 West. This well is approximately 5 miles south of a well previously drilled in Section 3 of an area covering Sections 2–4, both inclusive, and Sections 9 and 10, of the same Township and Range, wherein 640-acre drilling and spacing units had been established, for wells producing gas from the Hunton Lime formation, by the Commission's Orders numbered 66311 and 68437, respectively, which were entered before the Commission's hearing on the present Applications.

Ward's Freed Well is less than 2 miles north of another area in which the Star-Lacey Field has been developed on 640-acre drilling and spacing units.

Ward's Application to the Commission was for it to create "drilling and spacing units for the production of gas and gas condensate from the Chimney Hill section of the Hunton Lime formation underlying Sections 34 and 35" in said Township and Range. Ward therein alleged the depth at which his Freed Well encountered what he referred to as the "Chimney Hill section" of the Hunton Lime formation (which formation is hereinafter referred to merely as the "Hunton"), and he further alleged, among other things, that "said well is producing in a zone that is separate and distinct from any other wells in * * *

(its) vicinity * * *", and "* * * (that said well) has discovered a new and separate common source of supply * * *". In said Application, Ward recommended that 160-acre drilling and spacing units be established for such production in said Sections 34 and 35, on the basis of his opinion (expressed therein) that one well would adequately drain "all of the producible hydrocarbons underlying each 160 acres."

Tenneco's Application was for the Commission to amend its previous Order No. 68437, supra, to include Sections 14–16, both inclusive, Sections 22–23, both inclusive, Sections 26–28, both inclusive, and Sections 33–35, both inclusive. This Application referred to both the Hunton (at a depth of 8,600 feet) and the Mississippi Lime formation (at a depth of 7,100 feet) as "common sources" of gas supply, and alleged that 640-acre well spacing units should be established in the described geographical area, with the one permitted well for each unit, being located no closer than 1,320 feet to its unit's boundary.

At the Commission's hearing before one of its Trial Examiners on these two Applications, it was shown that Ward's leasehold estate, on which the Freed Well is located, covers the entire NE/4 of Section 34, supra, and that, besides this 160-acre tract, he owns leases on 120 more acres in said Section, but that the remaining 360 acres in said Section are covered by leases owned by Tenneco. By the evidence he introduced at the hearing, Ward attempted to show that the gas and gas condensate encountered in his Freed Well is in a zone, or section, of the Hunton, other than the one from which the aforementioned Section 3 Well (5 miles to the north) produces and whose development in that area is, as aforesaid, covered by the 640-acre well spacing Orders numbered 66511 and 68437, supra.

On the other hand, Tenneco's evidence was directed toward showing that the Freed Well is producing from a part of the Hunton, even though it was encountered at a different depth than the production found in the Section 3 Well.

In the report he filed after the close of the hearing, the Commission's Trial Examiner recognized that there was a conflict in the evidence as to whether or not the production encountered in the Freed Well was from the same zone, or section, of the Hunton, as that from which the Section 3 Well is producing; but he concluded that whether "it may or may not be", said Freed Well "is producing from a section of the Hunton Lime, and that means any production from said formation from top to bottom; * * *". On the basis of the evidence, it was the Trial Examiner's finding that the area involved should be included in an extension of the 640-acre well spacing then covering the area to the north around the Section 3 Well, and that Ward's Application for 160-acre well spacing should be denied.

In the report, which the Commission filed more than a month later, it upheld its Trial Examiner's report as to the area comprised of Sections 26, 27, 28, 33, 34 and 35 only (Township 20 North, Range 10 West) and constituted each of those geographical sections a drilling and spacing unit for the production of gas and gas condensate from "the Hunton and Mississippi common sources of supply underlying * * *" them. The Commission's Order requires that each well "hereafter" drilled to said common sources of supply in that area be located not closer than 1,320 feet to its unit's boundary, but it excepts, from this requirement, wells that are being drilled, or have already been drilled, to those common sources of supply. The Order also contains the usual provision "pooling and unitizing" all royalty interests within each of those 640-acre drilling and spacing units and allowing each owner of mineral rights in those two common sources under any unit to participate in the unit well's production in the ratio that his interest bears to the unit's total acreage.

In his present appeal from said Order, Appellant complains that, on the basis of

the ratios that their respective leased acreages, in Section 34, bear to said Section's total acreage, the Order requires him to give Tenneco a 55% interest in the Freed Well, which, as aforesaid, is producing on a lease *owned entirely by him.* He points to the testimony establishing that this well will eventually produce hydrocarbons of a value of $5,695,000.00, and says that distributing 55% of this to Tenneco will result in his loss of $3,132,250.00, and that, unless the evidence is clear and convincing that all of Section 34's acreage is as productive as that in the leasehold on which said well is located, this Court—if it upholds the Order appealed from—will be taking property "away from one entitled thereto and dividing it with another party who is not entitled thereto * * * ".

■ In much of Appellant's argument, he concerns himself with attempting to show that the production of his Freed Well (now shut in, awaiting marketing facilities) comes from a section of the Hunton, from which none of the wells governed by either of the aforementioned previously-entered 640-acre spacing orders produces. Such argument presents no cause for reversal. In view of the testimony of the expert witnesses for both Ward and Tenneco to the effect that the Freed Well will drain gas and gas condensate from an area of 640 acres surrounding its site, or location, we agree with the Commission's Trial Examiner's finding, in effect, that it is irrelevant and immaterial (as concerns Appellant's complaint) from just what zone or section of the Hunton, said well produces. There was evidence introduced on behalf of both of the parties indicating that the Hunton's thickness, permeability, and porosity in the area involved varies, or is "erratic", and that said formation underlying the sections around Section 34 may not be as productive as the evidence indicates it is under that section. Be that as it may, Appellant makes no attempt to show that this will, in any way, affect his best interests. That possibility of lesser productivity in other sections, however, was obviously taken into account when the Commission entered its Order for 640-acre spacing, in the face of the testimony of Ward's economic analyst, Mr. Ylitalo, that four wells in Section 34 will produce more gas condensate (as well as greater gas income in terms of the near future, or of "present value"—as the witness called it) than only one well on that 640-acre area. As hereinbefore indicated, however, the Commission's Trial Examiner found that to establish drilling units of a size that would necessitate the drilling of four wells on all geographical sections of land in the area, was not only unnecessary, but would result in (economic) waste. According to Mr. Ylitalo's testimony, it costs $113,000.00 to drill each such well, and an additional $40,000.00 to operate it.

■ We think there can be no serious dissent to the view that, according to the evidence, the boundaries of the common source of gas supply, in the area involved here, have not yet been defined by drilling, and, insofar as the record shows, proof of its limits and character, in that area, is far from complete. As supporting the Commission's Order for 640-acre drilling and spacing units, Tenneco points to what was said in our opinion in Panhandle Eastern Pipeline Co. v. Corporation Comm., Okl., 285 P.2d 847, 853, as to the advisability of wide spacing in such a new and undeveloped area. We were speaking of the same opinion when, in the later case of Landowners, Oil, Gas & Roy. Own. v. Corporation Com'n., Okl., 415 P.2d 942, we said:

"We also recognized the risk, without such a requirement (and under wide spacing) of some owners of mineral interests being enabled to share, at least, for a time, in production to which subsequently developed knowledge (whether gained from wells later drilled on smaller units, or otherwise) indicates they were never entitled, because of the (subsequently established) unproductivity of the locus of their interests. But, in said opinion ([285 P.2d] p. 853) we had also noted that the prevention of wasteful, exces-

sive drilling (as well as the protection of correlative rights) was a primary Legislative consideration in the enactment of the original Well Spacing Act. And, we concluded that it has been the policy of the Legislature to tolerate the lesser hazard (i. e., the possibility that some production, or production proceeds, may be taken from some owners rightfully entitled to it, and transmitted to others not so entitled) ' * * * in preference to the greater hazard to the greater number of owners, and the State in the dissipation of its natural resources by excessive drilling.'

* * * "

Consistent with the above, and with the undisputed evidence of the erratic nature of the Hunton's thickness, permeability and porosity in this new and largely undeveloped area, we think the Order appealed from in this case indicates an exercise, by the Commission, of its technical skill and experience in refusing to give its approval to spacing that might result in much economic waste by drilling of unnecessary wells. While it may be that the less rapid withdrawal of gas from the common reservoir may initially result in the production of less gas condensate in Section 34, as Mr. Ylitalo, in his testimony, predicts, there is no proof that the other sections of the land covered by the Order are as productive as that section, or that the same result will be obtained there. And it stands to reason that, if such underground physical waste does occur, it is not as likely to be so irretrievable, under future modifying orders that the Commission may enter on proper application therefor (in this connection, see Application of Peppers Refining Co., Okl., 272 P.2d 416, 424), as the economic waste inevitably resulting from future drilling of unnecessary holes under an order contemplating drilling on each quarter section.

In accord with the foregoing, the Order herein appealed from is hereby affirmed.

All the Justices concur.