UNION TEXAS PETROLEUM, A DIVISION OF ALLIED CHEMICAL CORPORATION; Champlin Petroleum Company; Atlantic Richfield Company; Amerada Hess Corporation; Eason Oil Company; Harper Oil Company; Singer-Fleischaker Oil Operating Company, Inc.; Oklahoma Natural Gas Company; Henry H. Gungoll Associates; L. O. Ward; Carl E. Gungoll; Woods Petroleum Corporation; Odessa Natural Corporation; Mack Oil Company; Okmar Oil Corporation and Ladd Petroleum Corporation, Appellants,

v.

The CORPORATION COMMISSION OF the STATE OF OKLAHOMA, Harvey W. Dierksen, et al., Appellees.

No. 53181.

Supreme Court of Oklahoma.

July 21, 1981.

Rehearing Denied March 8, 1982.

As Corrected March 9, 1982.

Dissenting Opinion March 9, 1982.

C. Harold Thweatt of Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, for Union Texas Petroleum, A Div. of Allied Chemical Corp., and Champlin Petroleum Co.

Duncan W. Holt, Jr., Dallas, Tex., for Atlantic Richfield Co.

Wyn Dee Baker, Tulsa, for Amerada Hess Corp.

Robert J. Emery of Lytle, Soule & Emery, Oklahoma City, for Eason Oil Co.

Russell F. Thompson of Monnet, Hayes, Bullis, Thompson & Edwards, Oklahoma City, for Harper Oil Co. and Singer-Fleischaker Oil Operating Co., Inc.

John A. Gaberino, Jr. of Huffman, Arrington, Scheurich & Kihle, Tulsa, for Oklahoma Natural Gas Co.

Gordon F. Brown, Brown & Lockhart, Oklahoma City, for Henry H. Gungoll Associates, Wood Petroleum Corp., Odessa Natural Corp., Mack Oil Co., L. O. Ward, Okmar Oil Corp., Ladd Petroleum Corp. and Carl E. Gungoll.

H. B. Watson, Jr., Richard K. Books, Oklahoma City, for Tenneco Oil Co. and Union Oil Co. of Cal.

Harvey Cody, Conservation Atty., Oklahoma Corp. Com'n, Jan Eric Cartwright, Atty. Gen., Oklahoma City, for Corp. Com'n of the State of Okl.

Walker, Walker & Corbyn by Barth B. Walker, Oklahoma City, for Harvey W. Dierksen, et al.

HARGRAVE, Justice.

This is an appeal from Order No. 148243 of the Corporation Commission of the State of Oklahoma dated January 3, 1979. That order vacated eighty-eight 640-acre drilling and spacing units, and established 160-acre drilling and spacing units. One hundred eleven applicants joined in the application which produced this order, and in that application they alleged that the prior orders of the Corporation Commission would demonstrate that the Mississippian formation constituted a single common source of supply in the region covered by the application and that the prior orders clearly demonstrated that there had been substantial change of conditions or knowledge of conditions as to that common source of supply, and that in order to prevent waste and protect correlative rights, that change in knowledge of conditions required that the previously existing 640-acre drilling and spacing units be vacated and that drilling and spacing units be established which created 160-acre drilling and spacing units for the Mississippian.

The Mississippian formation underlying the area covered by this application is a gas producer which produces increasing amounts of oil as proportionate to total

production along the southeastern portion of the area covered by the application. In that southeasterly portion there have been in the past a number of additional wells drilled on the basis of applications granted on an increased density basis by virtue of the oil production there had. The applicants sought to establish a change in knowledge of conditions underlying the land encompassed in the application and that that change in knowledge of conditions established that 640-acre Mississippian units were incapable of draining the entire formation in the area.

The appellants resisted the application to vacate the 640-acre spacing units and establish 160-acre drilling and spacing units, alleging there had been no substantial change in conditions and thus the application constituted a collateral attack on previous order of the Corporation Commission. Additionally, the appellants alleged that the Mississippian formation throughout this area is, in part, productive of oil as well as gas and the proper method to proceed upon that change in condition was by an order increasing the density of the drilling in the previously existing 640-acre units, noting that the spacing and respacing on proof of change of condition is contrary to the historical policy of the Commission which has been to increase density rather than vacate units and reestablish on the basis of smaller acreage. Appellants Tenneco Oil Company and Union Oil Company of California argue in their appeal that the subject order must be vacated because it was entered by the Corporation Commission outside of the regular pursuit of its authority. The basis of such a proposition is that the June 13, 1978 application of the appellee, which is the original application producing the order upon which this appeal is based, failed to list the appellants Tenneco and Union then owning interests in the area sought to be de-spaced, and that those two appellants had received no notice of the proceedings. Despite this lack of notice, Union and Tenneco made a special appearance before the Commission prior to the hearing on the order objecting to the jurisdiction of the Commission on that basis and requesting the application be dismissed. Argument was heard prior to the hearing on the merits and the motion to dismiss was denied by the Commission's order of July 7, 1978. This failure to properly serve Union and Tenneco allegedly resulted in a violation of the Commission's own rules and regulations and of the appellants' right to due process, under the line of cases arising out of *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

Appellants Union Texas Petroleum, a division of Allied Chemical Corporation, Champlin Petroleum Company, Atlantic Richfield Company, Amerada Hess Corporation, Eason Oil Company, Harper Oil Company, Singer-Fleischaker Oil Operating Company, Inc., Oklahoma Natural Gas Company, Henry H. Gungoll Associates, L. O. Ward, Carl E. Gungoll, Woods Petroleum Corporation, Odessa Natural Corporation, Mack Oil Company, Okmar Oil Corporation, and Ladd Petroleum Corporation, raise four propositions of error for disposition in their appeal. First, that there is no substantial evidence showing a change in conditions or knowledge of conditions which would authorize the Corporation Commission to vacate its prior 640-acre drilling and spacing unit order. The second point is that the decision of the Commission to destroy the 640-acre drilling and spacing units and thereupon establish 160-acre units is an arbitrary act which violates the vested rights of the owners of the oil and gas leases held by unit production and the vested rights of the royalty owners. Included in this point is the assertion that there is no evidence to support the Commission's choice from among the two statutory remedies of permitting increased density of drilling or vacation of the established drilling units and creation of smaller drilling and spacing units in their place. The third point made by these appellants is that the order fails to include some 640-acre drilling and spacing units in the same common source of supply, thereby violating the correlative rights of the owners. The fourth point made in this appeal by these appellants is that the appli-

cants did not comply with the rules of the Commission and that proper response to these failures by the Commission should have been to dismiss the application upon motion made prior to commencement of the hearing.

The orders of the Corporation Commission amended by the order now on appeal start with an order establishing 640-acre drilling and spacing units for the Mississippian gas and gas condensate common source of supply within a 40 square mile area in Major and Garfield Counties dated June 22, 1962. As of that date, only two wells had been completed in the area. That order finds one well adequately drains 640 acres. A year and a half later, the Corporation Commission found in its Order No. 53477 that Sec. 26, T22N, R8W, comprising a 640-acre drilling and spacing unit, was in fact oil productive, and further found that three additional wells were necessary to drain that unit. Those wells were permitted by the order and were found necessary to effect drainage of the section, and to date, only two of the three authorized wells have been drilled, the latter of those two having been drilled in 1978. A later order found the Mississippian in this area to be a combination oil and gas reservoir. The Corporation Commission's Order No. 50337 established 640-acre drilling and spacing units for the Mississippian as gas and gas condensate common source of supply for a nine square mile area in Garfield County, located one mile from the area covered by Order 49133. The order now appealed from establishes as one common source of supply the area as covered in Order No. 49133 and Order No. 50337. The findings of the Corporation Commission incorporated in the now-appealed Order No. 148243 set forth the following:

When previous Order No. 49133 was issued only two wells had been drilled within the area. When Order No. 50337 was issued, only one well had been drilled within the covered area. Six hundred and forty acre drilling and spacing units were first established because the Mississippian was indicated to be gas and gas condensate common sources of supply,

and it was then concluded that one well could be expected to effectively drain the recoverable gas and the condensate from those 640-acre units. These two initial orders cover the Mississippian, a common source of supply, although the orders treated the areas as separate from each other. At the time of the issuance of these two orders, it could not have been reasonably foreseen that both oil and gas would be found in the areas. There has been a substantial change in conditions and knowledge of conditions in the Mississippian Lime as to the hydrocarbon saturation, oil, gas and gas condensate. There has also been a substantial change in knowledge of conditions relating to the effective drainage radius of the well sunk to the Mississippian Lime and of the attributes of such formation, particularly porosity, permeability, water saturation, hydrocarbon saturation, pay thickness and lithography.

The Commission also found that there had been a substantial change in the orderly development of the area by the necessary granting of numerous exceptions to well density and drilling and spacing unit size, irrespective of the pattern contemplated by the issuances of Orders No. 49133 and 50337. The Commission then determined that the development of the Mississippian Lime in this area viewed in respect to the production of wells already drilled in conjunction with the drilling and production of wells which will be required in the future demonstrates that a more orderly administration of the area is necessary to assure that those wells reasonably required to prevent waste and protect the correlative rights can or will be drilled. The Commission's conclusions delineate the following:

The evidence of applicants and of the protestants is comparable on the point of the conditions and knowledge of conditions in the Mississippian Lime when the two orders, No. 49133 and 50337, were issued. Similarly, the evidence is comparable when viewed from the standpoint of the now known conditions and knowledge of conditions. However, despite

comparable knowledge derived from both historical and current development in operations the two parties differ as to the most reasonable and equitable basis for future orderly development. Protestants have been granted numerous exceptions to Orders 49133 and 50337 as amended. Those exceptions relate to density and variation of drilling unit size upon allegations and proof that there had been a change in conditions or a change in knowledge of conditions in the formation. However, they now contend there has been no change of conditions or knowledge of conditions with respect to the 640-acre units.

The order continues, noting the protestants have urged the appropriate statutory remedy (of the two statutorily provided) is to further develop the area on an increased well density basis upon application of an owner in the unit. The order then notes the interest of the Commission in the prevention of waste and protection of correlative rights requires that the Commission, in this instance, not delegate the responsibility for initiation of requests for increased density drilling to owners whose subjective interest in the premises may be in conflict with the ends of waste prevention or correlative rights protection. Further, the order recites there is substantial evidence to show that there has been and is now a change in conditions and knowledge of conditions, arising from the historical development in production and the area covered by the application. The change recited in the order is that the Mississippian Lime is far less conducive to effective and efficient drainage by one well on a 640-acre unit than it was thought and contemplated to be when Orders 49133 and 50337 were issued in 1962. The 640-acre unit was found not to be

causing the Mississippian formation to be effectively and efficiently drained, resulting in unnecessary depletion and inefficient utilization of gas energy pressure in the common source of supply. The order further states that correlative rights cannot be thus protected by the continuation of 640-acre units. The Mississippian within the application area required 160-acre drilling and spacing units be established, and that a well on each 160-acre unit is necessary to effectively and efficiently drain a portion of the reservoir allocated to it. The order then concluded by vacating previous Order No. 49133 and 50337 as amended as to the Mississippian from 6,300 feet to 6,700 feet below the surface and as to 640-acre drilling and spacing units established by those orders. The order then established 160-acre drilling and spacing units. The order then noted: Piecemeal relief has been given in prior times by increasing the density of wells upon the 640-acre units but the Commission concludes here that the establishment of 160-acre units is the proper relief, notwithstanding the fact that other relief is available based on substantial evidence herein.

■■■ Tenneco Oil Company and Union Oil Company of California propose the judgment must be vacated here on appeal because, as the transcript of the hearing on the motion to dismiss reveals, neither of these parties received notice of this proceeding. Additionally, they point out the affidavit of mailing notice filed June 29, 1978 indicates no notice was sent at all to Union and was sent to an improper address for Tenneco. These appellants state that notice and service of pleadings upon parties owning the right to participate must be made under Rule 8(d)(3)[1] of the Oklahoma Corporation Commission Rules of Practice.

1. "(d) Service in Special Cases:

    ·    ·    ·    ·    ·

(3) Applications for Amendment of Conservation Orders. At any time subsequent to the commencement and prior to the plugging and abandonment of a well upon a drilling and spacing unit, in lieu of service under subsection (b) of this rule, notice of hearing of an application to vacate, alter, modify or amend an order creating a drilling and spacing unit; to delete

land from, increase or decrease the size of the drilling and spacing unit or for increased or decreased density of wells within the unit, shall be served by the applicant by regular mail *upon each person having the right to participate in production from the unit.* An affidavit shall be filed prior to hearing the application, stating the names and addresses of the persons so served, and that notice has been mailed pursuant to this rule." (Emphasis added)

Failure to do so violates the last cited rule and does violence to appellants' right to due process under *Mullane v. Central Hanover Bank & Trust,* supra, and *Bomford v. Socony Mobil Oil Co.,* 440 P.2d 713 (Okl.1968). Appellants contend that the Corporation Commission is restricted in the valid exercise of its statutory authority to follow its administrative rules, and further that the Commission may not correctly act outside of those rules, citing *H. F. Wilcox Oil & Gas Co. v. State,* 162 Okl. 89, 19 P.2d 347 (1933), and *Pacific Molasses Company v. F.T.C.,* 356 F.2d 386 (5th Cir. 1966). Appellants admittedly cite pertinent authority in *Mullane,* supra, and *Bomford,* supra. Although familiar, the footings of the *Mullane* decision are both abstractly fundamental and immediately indispensable to the resolution of the error here offered. This action involves the roots of the holding of *Mullane,* and the basis upon which it rests. In *Mullane,* at 339 U.S. 313, 70 S.Ct. 656–657, the Supreme Court noted that although controversy has at times raged about the meaning of the due process clause, it affords at least a limitation requiring that a deprivation of life, liberty or property by adjudication be preceded by notice and the opportunity for a hearing appropriate to the nature of the action. The fundamental requisite of due process of law is the opportunity to be heard. *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914). The opportunity to be heard is worthless without notification of the occasion requiring it, so that the affected individual may choose for himself whether to appear or default. In *Mullane,* supra, the court looked to the steps necessary to assure that notice is reasonably calculated under all the circumstances to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections, stating that the notice given must be such as is reasonably calculated to convey the required information in a timely manner so as to allow interested parties to make their appearance. The common thread of the opinion is reasonableness. "The criterion is not the possibility of conceivable injury, but the just and reasonable character of

the requirements having reference to the subject with which the statute deals." *Mullane* at 339 U.S. at 315, 70 S.Ct. at 657. The central point made in *Hanover* is that notice must be reasonably calculated to import actual knowledge of the suit.

■ Appellant Union Oil Company of California states it was never served by mail. The affidavits of mailing confirm that allegation. Appellant Tenneco Oil Company states service upon it was improper in that "the notice sent to Tenneco was improperly addressed." There is no allegation in the briefs, or lengthy record of this appeal, which indicates there was any prejudice resulting from the improper address on Tenneco's notice. The record indicates service by mailing was made. If the incorrect address resulted in failure to give notice that fact should have been raised. The appellant, Tenneco, has not alleged in the proceedings before the Commission that the improper address resulted in failure to impart notice. A mere defect in formal style or nomenclature will not invalidate service of process unless it actually resulted in failure to give notice, as can be discerned from the excerpts from *Mullane* which demonstrate the inquiry is centered on what steps are necessary to impart actual notice, and not formalistic ritual of service of process.

■ Here the appellant has offered as a jurisdictional error the mailing of notice to Tenneco at an incorrect address. The record discloses publication notice in Oklahoma County and the two counties in which the land is located, as well as a mailing of notice to Tenneco. Tenneco's mailing address utilized here was the "Cuidad Building." Whether this address is correct or not is not a matter disclosed by the record on this appeal. No attempt was made to demonstrate the erroneous nature of the address during the motion to dismiss when this jurisdictional error was offered. Such evidence woudl appear dehors the record,— therefore the record does not demonstrate that the order here appealed is void for failure to acquire jurisdiction over the person of Tenneco.

The error offered fits within the rationale of *Vinson v. Oklahoma City,* 179 Okl. 590, 66 P.2d 933 (1937), wherein the failure to mail copies of the petition and notice there offered as reversible error do not appear on the face of the record. The judgment affirmatively negated the alleged failure, reciting that all defendants not answering or appearing have been served with summons personally or by publication. In reference to this aspect of the cause, the second Court syllabus holds that where service is obtained by publication and the judgment recites service is proper, the judgment is not void on its face, consequently an attack on the judgment on the basis of failure to mail a copy of the petition and publication notice can only be made under the provisions of the predecessor of 12 O.S.1971 § 1031, Third. In *George v. Kinard,* 84 Okl. 95, 202 P. 503 (1921), the Court stated a judgment is not void in the legal sense for want of jurisdiction, unless its invalidity and want of jurisdiction appear on the face of the record; it is voidable merely where the objection is raised because of failure to serve process.

Here the proceeding was questioned at its outset by Tenneco on the ground "that the notice was sent to the wrong address." However, no evidence of the extrinsic fact of the correct address or failure to impart notice arising from the address listed was offered, and thus the order of the Corporation Commission stands unchallenged by proof or offer of the extrinsic fact necessary to demonstrate its invalidity.

■ As to Union Oil of California, however, the holding of the recent case of *Cravens v. Corporation Commission,* 613 P.2d 442, (Okl.1980), is controlling. The record contains no notice of a mailing to this entity and thus the record demonstrates the Commission attempted to proceed against Union's interest in the absence of jurisdiction over the person of that entity. Accordingly, the order's attempt to adjudicate the rights of Union Oil of California is ineffective, and a nullity insofar as it purports to affect its interests.

■ The appellants Union Texas Petroleum, Champlin Petroleum, Atlantic Richfield, Amerada Hess, Eason Oil, Harper Oil, et al., direct their first proposition of error against the merits of the proceeding, arguing the Commission was without authority to amend its previous order inasmuch as the evidence disclosed no substantial change of conditions. This contention is based upon the prohibition contained in 52 O.S.1971 § 111 against collateral attacks upon a final order of the Corporation Commission. Under that statute, and the cases arising out of it, such as *Wood Oil Co. v. Corporation Commission,* 205 Okl. 534, 239 P.2d 1021 (1950), and *Phillips Petroleum Co. v. Corporation Commission,* 461 P.2d 597 (Okl.1969), an application for an order of modification constitutes a collateral attack on the prior order where that modification is not based upon substantial evidence showing a change of conditions or knowledge of conditions arising since the last order. *Phillips Petroleum Company,* supra, illustrates the fact that the change of conditions or change in knowledge of conditions necessary to support an order of modification speaks to knowledge or conditions which did not obtain at the time the prior order was considered, and not to evidence of conditions or knowledge of conditions which could have been brought forward at the time of the hearing on the prior order but were not considered at that time.

*Phillips,* supra, cites with approval 11 Okl.Law Rev. p. 125, "Modification Order Pertaining to a Common Source of Supply" at pp. 132 and 133, where the author of the article states: "Logically there are three kinds of change of condition possible. The first type of change of conditions is characterized by an actual change in the physical behaviour of the reservoir occasioned by development and depletion. Second is a change in the information gained from development or depletion experience which demonstrates that the original conclusions reached were incorrect as applied to the studied reservoir, and the third type is, in essence, a change in the technology used to exploit the reservoir, bringing to bear new concepts of waste and correlative rights."

As the appellants recognize in their brief in chief, a change of condition alleged to justify a modification of a prior order of the Corporation Commission in this action was that new knowledge has been obtained that in this area a Mississippian gas well would not drain a 640-acre unit. The appellants contend there is no substantial evidence to sustain this finding and that the Commission should have denied the application on that basis.

The appellants also note that under *Harper Oil Co. v. Hayes,* 431 P.2d 387, (Okl. 1967), and *Meredith v. Corporation Commission,* 368 P.2d 828, (Okl.1961), a spacing order of the Corporation Commission applies to all wells in the common source of supply whether or not an individual well turns out to be an oil well or a gas well. Appellants contend that it has been known for a considerable period of time that the Mississippian formation in the area covered by the orders under consideration now has been capable of oil as well as gas production. This contention is intended to demonstrate there has been no change in knowledge of conditions obtaining since the prior orders, thus defeating the modification here granted. This known fact is not determinative of the issues here presented, which revolve around the inability of the 640-acre unit to be adequately drained by a single well in light of the additional experience with the character of the formation through drilling and production since the last orders were issued. This additional experience was recognized in *Phillips Petroleum Co. v. Corporation Commission,* supra, as a viable ground upon which to base a motion to modify a prior Corporation Commission order. Thus the inquiry remains: Is the order of modification supported by substantial evidence that a well in this locality of the Mississippian formation would not drain 640 acres? The order initially establishing 640-acre units, 49133, was issued after two wells had been completed in a 40-square mile area. Finding No. 4 from that order reads:

"... One well will adequately drain the gas and gas condensate from said formation underlying 640 acres and that it is unnecessary to drill wells on a closer pattern."

The appellee contends that a substantial change in knowledge of conditions is established both by the primary evidence in this cause and by reference to the prior actions taken in the Corporation Commission by the appellants themselves. An example from testimony in this cause is taken from testimony of Mr. F., qualified as an expert without objection. He states Finding No. 5 in Corporation Commission's previous order 134466, in his opinion, is generally applicable through all the units in this particular case. Finding No. 5 recites:

"That applicants' Wuerflein No. 1 well is now 80 to 90% depleted and applicants' experience in the infield drilling of Mississippian wells on existing spacing units in the area which were previously developed by drilling one well has demonstrated that after the initial wells in each drilling and spacing unit were substantially depleted, the additional well in said drilling and spacing unit encountered initial shut-in bottom hole pressures and production volumes which were comparable with the initial shut-in bottom hole pressure and unit production volumes of the first wells drilled in each unit."

This same witness testified that, in his expert opinion, Paragraphs 7 and 8 of the findings in that same order would apply to each of the drilling and spacing units included within the purview of the action here appealed. Quoting from the record where the provisions of Paragraphs 7 and 8 are recited into the record:

"Applicant has concluded that the infield wells drilled on each unit penetrated a portion of the Mississippian common source of supply that is not being adequately drained by the initial well and that the reservoir conditions in the Mississippian formation common source of supply underlying the lands described in the caption hereof are believed to be comparable in all respects to the conditions encountered in the units on which the Mississippian infield drilling has taken place in the area, so that it is reasonable

to conclude that the Wuerflein Unit No. 1 well will not adequately and completely drain the recoverable gas in the Mississippian formation."

"It appears that the Wuerflein unit well will not adequately and completely drain the recoverable gas in the Mississippian formation underlying the unit, and that a second well on said formation will recover additional gas and associated hydrocarbons that will not be produced from existing wells."

The record also indicates a similar finding in Order No. 140576 wherein Finding No. 8 in that order states:

"That the testimony was that it is economically feasible to drill a third well on this spacing unit, and that a third well will recover additional oil and gas that would not otherwise be recovered by existing wells."

Mr. F. testified that in his expert opinion he would reach the same conclusion in consideration of each and all of the drilling and spacing units covered by this application on appeal.

The Commission's report included in Order # 148243 contains the better part of nine legal pages of single-space typing containing the history of modifications of the two base orders, 49133 and 54890. This history demonstrates that order 49133 has at times included twice as many section units as are presently under its purview. Twenty-five of these sections have been authorized additional wells and of these a substantial percentage have been altogether excluded from the original order. Many of these orders reviewed exclude sections from the order and establish smaller units or allow additional wells on the basis that the unit is unable to drain or on the basis that there is a change in production from gas to oil or in the knowledge of the mechanics of the formation.

The Commission's report shows that order 50337 originally formed 640-acre spacing on nine sections on the basis of one previously drilled well. Thereafter that order was extended and some sections then included were deleted later and spaced in 80-acre units for oil.

The Corporation Commission's order here appealed from then states the following after reviewing the history of the two orders:

1. The two parent orders, 49133 and 50337 were issued upon the strength of a total of three well drilling experiences showing a gas and gas condensate field.

2. At the time of issuance it could not reasonably have foreseen the mixed character of the common source or the numerous exceptions both to density of drilling and spacing unit size necessary to prevent waste and protect correlative rights.

3. There has been a substantial change in knowledge of conditions and characteristics of the formation, such as hydrocarbon saturation, oil and gas mix, effective drainage radius, and formation characteristics such as permeability, water saturation and effective pay thickness.

4. There has been a substantial change in the orderly development of the areas considered than was contemplated at the time the original orders were issued.

5. The conditions, and knowledge of them, now prevalent pertaining to the formation and current production as well as future production require a more orderly development than that had under the 640-acre unit and exception therefrom procedure.

The conclusions made by the Corporation Commission included in the order appealed here note that the protestants and applicants differ more in their proposed solutions to future equitable production than in substantive differences as to past and present known conditions of the Mississippian. The conclusions state that in past times, protestants have obtained exceptions by way of variations in drilling unit size and increased density orders on the basis of allegations of change of condition but now protestants are contending that there has been no change of condition justifying a modification order. The Commission concluded that the protestants desire to have further development on an increased density basis upon application

by an owner of a unit when he determines that such action should be taken. The Commission concluded leaving that decision to the individual unit owners, under the circumstances, amounts to an indirect delegation of its duty to oversee prevention of waste and protection of correlative rights. Additionally the Commission concluded that the Mississippian is less conducive to drainage by 640-acre units than was contemplated when the parent orders were issued. The pressure depletion now experienced will not drain a 640-acre unit, resulting in inefficient utilization of gas energy in the common source which will cause substantial quantities of oil, gas and condensate not to be recovered by a continued 640-acre unit. The Commission concluded that 160-acre units are reasonably required to drain the reservoir effectively and efficiently, notwithstanding the recognized existence of alternate forms of relief that may be available based upon the substantial evidence submitted.

The Commission heard evidence from both sides of the controversy, and various research methods and validity of statistical analyses, and conclusions drawn therefrom were closely contested and conflicting. The appellants' contention that there is no evidence of substantial change of condition upon which to base an order of modification is refuted by reference to the history of the Commission's orders relative to the area covered by the parent units, and by the allegations of change of condition made in earlier proceedings by some of the contestants herein. Those allegations of change of condition gave the Commission a factual basis upon which to modify orders and grant exceptions. Referring to appellants' Exhibit # 40, we note that roughly thirty-four sections have been allowed additional wells in the area covered by the parent orders and fifty sections have been deleted from those orders for reasons which generally support showing of change in knowledge of the characteristics of the formation.

█ An objection to an order made by the Corporation Commission does not initiate an independent inquiry in this Court as to the factual support for the order under Article IX, Section 20, Oklahoma Constitution, unless an asserted violation of either state or federal constitutional principles is to be reviewed. *Anderson-Prichard Oil Corp. v. Corporation Com'n,* 205 Okl. 672, 241 P.2d 363 (1951). However, an allegation of violation of those constitutional principles by issuance of an order not supported by substantial evidence does not invoke an independent review of the evidence. *Cameron v. Corporation Commission,* 414 P.2d 266 (Okl.1966).

█ The Commission has a wide discretion in the performance of its statutory duties, and this Court may not substitute its judgment upon disputed factual determinations for that of the Commission but is restricted to a determination of substantial evidentiary support for the order issued under authority of the statutes. *In re: Application of Continental Oil Company,* 376 P.2d 330 (Okl.1962). Searching a record for substantial evidence supporting the order appealed does not entail a comparison of the parties' evidence to determine that which is most convincing but only that the evidence supportive of the order be considered to determine whether it implies a quality of proof inducing a conviction that the evidence furnished a substantial basis of facts from which the issue could be reasonably resolved. *Chenoweth v. Pan American Petroleum Corp.,* 382 P.2d 743 (Okl.1963). Substantial evidence has been additionally outlined as something more than a scintilla; possessing something of substance and of relevant consequence carrying with it a fitness to induce conviction, but remains such that reasonable men may fairly differ on the point of establishing the case. A determination of substantial evidentiary support does not require weighing the evidence but only a measurement of the supportive points to determine whether the criterion of substantiality is present. *Central Okla. Freight Lines v. Corporation Com'n,* 484 P.2d 877, 879 (Okl.1971).

█ A review of supportive facts here present compels the conclusion that the order is supported by substantial evidence.

Previous Corporation Commission orders have granted deletions and increased density orders to some of the appellants on the basis of change in knowledge of conditions and these changes have been made on approximately half the acreage comprising the area covered by the two parent orders and this order.

Appellants object to the order here issued on the additional basis that there is no substantial evidence to support the Commission's action of ordering deletion of the large units as opposed to ordering increased density drilling on established units. Such an allegation of error is insufficient to disturb the Commission's order on the basis of statutory authority and the evidence disclosed in the record. Factually, the record contains indicia that for extended periods of time, Commission orders allowing additional wells on the basis of inability to recover known reserves have not been carried out. Known inability to recover product and protect correlative rights after a demonstrated change in knowledge of conditions has not been remedied in the area by past orders to increase density, and under 52 O.S.Supp. 1978 § 87.1 d, the alternative remedy granted here is decreasing the size of the well units. That portion of the last mentioned statute reads:

The Commission shall have jurisdiction upon the filing of a proper application therefor, and upon notice given as provided in subsection (a) above, to decrease the size of the well spacing units or to permit additional wells to be drilled within the established units, upon proper proof at such hearing that such modification or extension of the order establishing drilling or spacing units will prevent or assist in preventing the various types of wastes prohibited by statute, or any of said wastes, or will protect or assist in protecting the correlative rights of persons interested in said common source ...

Appellants cite *Grison Oil Corp. v. Corporation Commission,* 186 Okl. 548, 99 P.2d 134 (1940), as supportive of the proposition that private rights should be interfered with as little as possible where such disruption is necessitated by an exercise of the police power in the prevention of waste. It would be unusual to encounter a party disagreeable to such a statement. The Commission's conclusion that past density applications by owners in the unit have not uniformly developed the common source, and have not been carried out with dispatch, negates the allegation that both statutory remedies are equally suited to the facts, and substantial evidence supports the choice of alternatives made by the Commission.

Appellants additionally contend the Commission's order respacing these sections as 160-acre units must be reversed by virtue of the Commission's failure to respace the entire common source. As the exhibits demonstrate, the order here appealed covers the center of the two parent orders, while the parent orders extend southwest and north of the order appealed. Prior orders have stated that both parent orders cover the same common source.

As early as the motion to dismiss the Commission was requested to proceed on a piecemeal basis, one section at a time. At the hearing on the merits, the appellants also objected to consideration of such a large area in one proceeding. This was done both by reference to the burden laid on the parties by entertainment of a modification application on a 92-section area, and by objection to testimony on the basis that expert evidence should be limited in impact to the unit from which the engineering data was gathered. Appellants actively requested the Commission to consider the modification request on a piecemeal basis, but now seek reversal of the order on the ground that the one proceeding did not encompass the entire common source. Given this position taken in the hearings below, it is inappropriate to now allow reversal of the Commission's order on grounds which directly conflict with the parties' position below. Parties to an action on appeal are not permitted to secure a reversal of a judgment upon error which they have invited and acquiesced in, or to assume an inconsistent position from that taken in the trial

court. *Cimarron Valley Pipe Line Co. v. Holmes,* 182 Okl. 450, 78 P.2d 403 (1938); *Cities Service Oil Co. v. Merritt,* 332 P.2d 677 (Okl.1958). As early as *Morrison v. Krouch,* 141 Okl. 288, 285 P. 10 (1930), the related principle was considered as firmly established. In *Morrison,* the first Court Syllabus reads: "It is a well-settled rule that a party to a suit, having proceeded in the trial court upon a theory and lost, will not be permitted, upon appeal to this court, to change his theory and seek to reverse a case upon a different theory." The rule emanates from the very heart of the purpose served by an appeal. In *Breene v. Crawford,* 175 Okl. 186, 53 P.2d 244 (1935), the Court held that a defendant will not be allowed to shift his ground of defense on appeal in order to present another defense not presented nor relied upon in the trial court. To allow such a traverse in theory at the appellate level thwarts the very basis of the appellate process. The purpose of an appeal is not to present an opportunity for a trial de novo, but to review the correctness of the rulings made upon the arguments of the trial court. The parties to an action, having presented their case for defense to the trial court upon a certain theory, are bound thereby and will not be permitted to change the theory of the case upon appeal. See also: *Knox v. Eason Oil Co.,* 190 Okl. 627, 126 P.2d 247 (1942); *Louis Berkman Co. v. Unger Metals Corp.,* 190 Okl. 101, 121 P.2d 606 (1942); *Foster v. Higginbotham,* 186 Okl. 276, 97 P.2d 63 (1939); *Secrest v. Williams,* 185 Okl. 449, 94 P.2d 252 (1939); *Cadwell v. Ryan,* 185 Okl. 158, 90 P.2d 887 (1939); *U. S. Fidelity & Guaranty Co. v. State ex rel. Shull,* 169 Okla. 59, 36 P.2d 47 (1934); *Ward v. Continental Ins. Corp.,* 169 Okla. 59, 36 P.2d 47 (1933); *Cope v. Johnson,* 123 Okl. 43, 251 P. 985 (1926).

The order of the Corporation Commission is determined to be supported by substantial competent evidence and is therefore affirmed; provided that no part thereof is valid insofar as it affects the rights and interests of Union Oil of California, and is reversed insofar as it attempts to adjudicate the rights of Union Oil of California.

REVERSED IN PART; AFFIRMED IN PART.

WILLIAMS, LAVENDER, DOOLIN and OPALA, JJ., concur.

IRWIN, C. J., BARNES, V. C. J., and HODGES and SIMMS, JJ., dissent.

BARNES, Vice Chief Justice, dissenting.

Upon rehearing in this cause and upon reconsideration of the opinion promulgated herein on July 21, 1981 (52 OBJ (Vol. 52—No. 30) 1857), I hereby change my vote from "concur" and must respectfully "dissent".

My first departure from the Majority's conclusion pertains to the standard of review to be used in this case.

Article IX, Section 20, Oklahoma Constitution, makes two provisions relative to the duty and power of this Court in considering appeals from orders of the Corporation Commission. In appeals from orders of the Corporation Commission, "the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence." However, in those appeals involving an "asserted violation of any right of the parties" under either the State or Federal Constitution, "the Court shall exercise its own independent judgment as to both the law and the facts." Such independent review of the evidence is only invoked if Appellant points out "in what specific respect his constitutional rights have been violated" and if the constitutional violations are "clear-cut".[1] Appellants contend "that each of the 540-acre drilling and spacing units had been developed in the Mississippi Formation by the drilling of one or more wells, and the order of the Commission destroys existing equi-

---

1. *Cameron v. Corporation Commission,* 414 P.2d 266 (Okl.1966); and *Southern Union Gas*   *Co. v. Texas County Irrigation & Water Resources Association,* 564 P.2d 1004 (Okl.1977).

ties of both the royalty owners and the owners of the oil and gas leasehold estate and takes their property for private use in violation of Section 23 of Article II of the Constitution of the State of Oklahoma and deprives them of their property without due process of law in violation of Article II, Section 7, of the Constitution of the State of Oklahoma, and in violation of the Fourteenth Amendment to the Constitution of the United States of America." Such asserted constitutional violations could not be more "specific" or "clear-cut", and therefore this Court must exercise its own independent judgment in this case as to the law and facts. Whether the order appealed from falls within the first or second category, to be valid it must be lawful and supported by competent substantial evidence.[2] It is my opinion that using either the standard of independent review of the evidence or the standard of substantial evidence, it is clear, as will be discussed later, that the order in question is invalid and should not stand.

Secondly, I disagree with the Majority's holding that there was substantial evidence to support the conclusion that the wells on each of the eighty-eight 640-acre units covered by the application were not draining the units. This is the claimed "new knowledge" and change of condition upon which the application and the order of the Commission depend. The case cited by the Majority, *Phillips Petroleum Co. v. Corporation Commission,* 461 P.2d 597 (Okl.1969), states:

"... Because substituted substantive rights actually vest in the property owners by the force of such orders, the Oklahoma Supreme Court has laid down the rule that a modifying order will be condemned as a prohibitive collateral attack unless 'a substantial change of condition' has intervened between the dates of the existing and superseding orders."

The evidence reflects that the Mississippi Lime Formation underlying the area covered by the application is a heterogeneous reservoir. The southeasterly portion of the area covered by the application contains oil pods or oil pockets. It is known that there is a transition zone. A transition zone is an area where the wells produce both free oil and free gas. Everything north of the transition zone will be predominantly productive of gas, and everything south thereof will be predominantly productive of oil and gas. Appellants and Appellees agree that one well will not effectively drain the 640 acres in the oil area. Operators of the wells in the oil area had applied for and been granted permission to drill a number of additional wells in the drilling and spacing units lying within the oil "leg". The basis of the application for additional wells was that the oil reservoir underlying some of the drilling and spacing units could not be properly developed without the drilling of additional wells. A number of applications for increased density within some of the drilling and spacing units in the southern portion of the formation were on file at the time the application in this cause was filed, but hearings were postponed and will not be heard until this case is decided.

The Commission's Order No. 148243 despacing the eighty-eight 640-acre units and the Majority's conclusion that such order was supported by substantial evidence are based on the proposition that new knowledge has been obtained which demonstrates that *none* of the Mississippi wells on *any* of the eighty-eight governmental sections covered by the order will effectively drain the units. This conclusion is based upon the testimony and calculations of Appellees' expert witnesses. Appellees' experts calculated volumetric estimates of gas in place and compared these estimates with pressure decline curve estimates of gas in place. From this comparison, the experts arrived at their estimate of the percentage of the 640-acre units that were being drained by the unit well.

A pressure decline curve will indicate how much gas will be produced from a particular well, but will not show the thickness or shape of the reservoir from which the gas will be produced. In a fractured reservoir, such as the Mississippi Formation,

2. *Anderson-Prichard Oil Corp. v. Corporation Commission,* 205 Okl. 672, 241 P.2d 363 (1951).

gas may travel considerable distance to reach the well and therefore the reservoir may or may not underlie the drilling and spacing units upon which the well is located, and may or may not be uniform in thickness. On the other hand, a volumetric estimate of gas in place makes the assumption that the entire drilling and spacing unit upon which the well is located is underlain with productive formation of equal thickness and ability to produce as that exposed in the wellbore. Put another way, an assumption is made that the same number of feet of pay found in a particular well will be found throughout the 640-acre unit. Every engineer who testified specifically on the point testified that such an assumption in the Mississippi Formation has no validity and that it is impossible to make a valid volumetric estimate of gas in place in the Mississippi Formation. The conclusions of Appellees' experts that existing wells were not draining the 640-acre units were based on the fact that their volumetric estimates of gas in place beneath the drilling and spacing units showed that there was more gas under the units than indicated by the pressure decline curve of the unit wells. The statements made by Appellees' experts that none of the unit wells, in the gas area, is draining the unit depends upon the correctness of the volumetric estimates, and the evidence establishes that it is impossible to make a valid volumetric calculation of the Mississippi Formation in this area.[3]

**3.** The testimony of Mr. H. for the Appellants concerning the use of volumetric estimates is as follows:

"Q. Did you use the volumetric estimates on the Mississippi Lime wells?
A. I haven't used the volumetric estimate since the mid-1960s and I only tried it once to convince myself that it was not a logical approach.
Q. Why do you find that to be the case?
A. The quality of the logs that are available and the quality of the information to identify porosity and water saturation and net feet of pay is unacceptable for reserve estimates.
Q. Is there any validity at all in your opinion in the results that you might obtain from volumetric estimates in the Mississippi Lime?
A. No.
Q. Do you have an opinion about Mr. Benton's computer calculation of the drainage area?

Therefore, the Appellees' position that the unit wells would not drain the 640-acre units, which depends upon the comparison of an imperfect volumetric calculation with the reliable pressure decline curve predictions, is not supported by substantial evidence and should fail.

In addition, the testimony reflects that there are only five units in the predominantly gas area which have been penetrated in the Mississippi Formation by more than one wellbore. The evidence reflects that the data obtained from the second well on these five units (less recovery of gas from the second well; no second well has found virgin pressure which is indicative that drainage has occurred) shows that the existing gas wells are draining the units.

The remaining units which have more than one well on them are in the oil area. Appellants make no contention that one well would effectively drain 640 acres in the oil area. In the oil area, where the operators had been given permission to drill for additional wells, the unit wells were not draining the oil and this was the reason for the applications to drill additional wells. The fact that a 640-acre unit within the predominantly oil area cannot be effectively drained by one well does not prove that a well on the gas portion of the reservoir will not drain the 640-acre unit.

Moreover, Appellants' expert, Mr. H., prepared an exhibit showing the gas/oil

A. I think the manner in which it was used is erroneous. It's a useful device but primarily what it did was to verify the pressure cumulative analysis that it was—if you examine the results of that and the results of pressure cumulative studies, you will see that there is a very good correlation between the two. And there should be because what it's doing is analyzing the performance of the well to date. But it requires entering an assumption as to the amount of net pay in the well in order to calculate drainage area, and if you don't know net pay, you can't calculate drainage area.
Q. So you are saying that the information that's provided is invalid and the results are invalid?
A. Yes."

ratios of the cumulative production from the units within the area of interest as of January 1, 1978. These numbers were calculated by taking the cumulative gas production and dividing by the cumulative oil production. In the northern area all of the wells had a gas/oil ratio in excess of 75,000 to 1. Mr. H. testified that "any well which has produced with a cumulative gas/oil ratio to date as high as 75,000 to 1 has to be called a gas well by anybody's definition." He further testified that in four of the units where there was an additional well that three of the four wells had shown no additional gas reserves would be recovered as a result of drilling the additional well, and these three wells appeared to be marginally economic or possibly uneconomic. He concluded that in the northern predominantly gas area one well would drain 640 acres.

I submit that either an independent review of the evidence or a review of the supportive facts compels the conclusion that there is no substantial evidence that one well in the gas portion of the reservoir will not drain a 640-acre unit, and therefore there is no change in knowledge of conditions. Without a change in knowledge of conditions supported by substantial evidence, the Commission's order is defective and cannot stand.

Thirdly, having decided that there is no substantial evidence of a change of conditions in the predominantly gas area, I cannot agree with the Majority's conclusion that the change of conditions in the oil area warrants de-spacing as opposed to increased density drilling. All parties agree that one well will not drain a 640-acre unit in the predominantly oil area. Therefore, there is substantial evidence of a change of condition in such area and the question then becomes one of deciding which statutory remedy dealing with this change of condition is supported by substantial evidence. Appellants argue that the Commission's choice of de-spacing is not supported by substantial evidence as such choice permits waste and fails to protect correlative rights. They further argue that such choice is unconstitutional as it is an unreasonable exercise of the police power which destroys the vested rights of the owners of the oil and gas leases held by unit production and the vested rights of the royalty owners under the tracts upon which the unit well is located, who have shared the production from the unit well with other owners in the 640-acre units for about fifteen years. I agree with Appellant's contentions based on case law, statutory authority, and the record evidence.

Section 87.1(d) provides in part:

"The Commission shall have jurisdiction upon the filing of a proper application therefor, and upon notice given as provided in Subsection (a) above, to *decrease the size of the well spacing units or to permit additional wells to be drilled within the established units,* upon proper proof at such hearing that such modification or extension of the order establishing drilling or spacing units will prevent or assist in preventing the various types of waste prohibited by statute or any of said wastes, or will protect or assist in protecting the correlative rights of persons interested in said common source of supply . . . ." (Emphasis added)

The Commission is thus empowered where there is substantial evidence of a change of conditions or knowledge of conditions to either change the size of the existing drilling and spacing units or to permit the drilling of additional wells in existing drilling and spacing units where such action is necessary to prevent waste or protect correlative rights. The fact that the statute gives the Commission a choice of remedies shows recognition by the Legislature that in some instances the proper remedy is a change in spacing, and in other instances intensification of drilling in the existing units is the proper remedy. Having been given a choice of remedies, it is incumbent upon the Commission to use the remedy which will best prevent waste and protect correlative rights. In *Denver Producing & Refining Co. v. State,* 199 Okl. 177, 184 P.2d 961 at 964 (1947), we stated that: "In striking a balance between conservation of natu-

ral resources and protection of correlative rights, the latter is secondary and must yield to a reasonable exercise of the former."

Is the Commission's order necessary to prevent waste? The record evidence reflects that a change in spacing from 640-acre units to 160-acre units results in the drilling of many unnecessary wells in the predominantly gas area covered by the application, thus causing economic waste.[4] It is common knowledge that the price of gas from the 1960s to present has gone from twenty cents to about two dollars per MCF, and a billion cubic feet at two dollars per MCF will pay for a well costing $350,000.00, but it is still economic waste if the well is unnecessary. Appellees' experts testified that there would be more rapid development under de-spacing; however, the fact that there may be faster drilling if the leases are thrown up for grabs does not prove waste. Appellees' experts, in fact, testified that there would be no difference in the recovery of hydrocarbons whether the wells are drilled now or ten years from now. Admittedly, in the predominantly oil area, additional wells are necessary in order to produce the oil; however, the record indicates that such wells are being applied for and drilled pursuant to orders of the Corporation Commission permitting increased density in the units. The Commission cannot assume that the operators are going to leave oil and gas in the ground that is economical to produce. However, if an operator fails to apply for increased density, the royalty owner is not without remedy. A royalty owner has the right to request intensification of drilling.[5] If the operator, after the Commission grants permission to drill an additional well does not drill one, the royalty owner may proceed in the District Court in an action for lease cancellation for failure to develop in the manner of a prudent operator. In addition, there is no guarantee that more rapid development would occur through de-spacing. Most de-spacing and increased density orders only

*permit* additional wells to be drilled; but economic, reservoir engineering and geological factors are the actual determinants as to whether an operator chooses to drill. In response to arguments from oil and gas operators who coveted some of the acreage included in the 640-acre units, and in response to the plea of some mineral owners that development was proceeding at too slow a pace, the Corporation Commission elected to break up the 640-acre units without any substantial evidence that waste would occur if the 640-acre units were left intact.

Is the order necessary to protect correlative rights? It is my opinion that the order not only is not necessary to protect correlative rights, but destroys and violates the same. Mr. Howard H. Harris, the author of an article entitled "Modification of Corporation Commission Orders Pertaining to a Common Source of Supply", dated May, 1958, Vol. 11, Oklahoma Law Review 125, states at page 130:

"3. Each individual owner has the right:

"A. To have the basic nature of its interests maintained and to have its contractual rights with other persons remain undisturbed, except insofar as abrogation is *absolutely necessary to effect accomplishment of the conservation objective;* . . ." [Emphasis added]

In concluding that smaller units are required to protect correlative rights, the Commission ignored the fact that the establishment of 160-acre units deprived the owners of existing leases, which were held by production of their property, and awarded them to the parties who had taken top leases in expectation that the Commission might be persuaded to enter such an order. The 640-acre unit wells have been in existence since the early 1960s and, but for the spacing orders, the owner or owners of the minerals under the land upon which the unit well is located would have received 100% of the royalty from the well. Because

---

4. See *Ward v. Corporation Commission,* 470 P.2d 993 (Okl.1970).

5. *Spaeth v. Corporation Commission,* 597 P.2d 320 (Okl.1979).

of the spacing orders, such owner has shared the royalty proceeds with the other mineral owners in the 640-acre unit. If the order of the Commission stands, such owner or owners will find that they now own 100% of the royalty attributable to the *partially* depleted unit well, and have been stripped of any participation in the production of any additional well or wells that may be drilled in the governmental section that formerly comprised the 640-acre unit. That parties who have shared their royalty under the compulsion of the statutory unit should be deprived of any right to share in the production from any additional wells that might be drilled in the unit acreage is a gross inequity and a violation of their vested rights. Thus, there is no substantial evidence that the order is necessary to protect correlative rights, but, in fact, the order violates those rights.

Indeed, the order entered unnecessarily takes the Appellants' property for the benefit of others and is an unreasonable extension of the police power in the prevention of waste and thereby violates the constitutional rights of Appellants. In *Oklahoma Natural Gas Co. v. Choctaw Gas Co.*, 205 Okl. 255, 236 P.2d 970 (1951), we stated that:

"Although private rights yield to the exercise of police power, they are not to be totally annihilated thereby, or interfered with to a greater extent than reasonably necessary, taking into consideration the real object to be accomplished."

Also, in *Cabot Carbon Co. v. Phillips Petroleum Co.*, 287 P.2d 675 (Okl.1975), we stated at page 679 that:

"The Corporation Commission's power to regulate the taking from the reservoir to prevent waste and protect correlative rights, even to fixing the price of production so taken, if necessary to accomplish these conservation purposes, does not extend to overturning private contracts where not necessary for such accomplishment."

In *Skinner v. State,* 189 Okl. 235, 115 P.2d 123 (1941), 115 P.2d at page 126, this Court said:

" 'Due process' has a dual significance, as it pertains to procedure and substantive law. As to procedure it means 'notice and an opportunity to be heard and defend in an orderly proceeding adapted to the nature of the case before a competent, impartial tribunal having jurisdiction of the cause. . . . In substantive law, due process may be characterized as a standard of reasonableness, and as such it is a limitation upon the exercise of the police power.' "

There was no substantial evidence that it was necessary or a reasonable exercise of the police power to decrease the size of the drilling and spacing units in order to prevent waste, and, by doing so, thereby terminate vested leasehold rights of lessees and the rights of certain royalty owners in their just share of production, instead of ordering increased well density. The action of the Commission was therefore arbitrary, invalid and unconstitutional in violation of Section 23 of Article II of the Constitution of the State of Oklahoma and deprives them of their property without due process of law in violation of Article II, Section 7, of the Constitution of the State of Oklahoma and in violation of the Fourteenth Amendment to the Constitution of the United States of America.

Further, I cannot agree with the Majority Opinion's conclusion when it states there is substantial evidence to support the Commission's choice of a remedy to de-space because "past density applications by owners in the unit have not uniformly developed the common source, and have not been carried out with dispatch." There is no evidence in the record to support this conclusion.

With respect to the conclusion that past density applications have not resulted in the uniform development of the common source of supply, it should be noted that applications to increase density are submitted on a unit-by-unit basis, the obvious consequence of which is that there is not the same number of wells on each unit. Obviously, as stated before, in the gas area only one well is required, while on the oil portion of the area up to four wells may be required.

With respect to the conclusion that past density applications have not been carried out with dispatch, the record is devoid of evidence to support this conclusion, except for the case of *Harper v. Hayes,* 431 P.2d 387 (Okl.1964), and, in fact, evidence in that case clearly contradicts such a conclusion. In every instance, except one, where an order was entered authorizing an additional well, a well was drilled. Only in *Harper* had the Commission entered an order permitting the drilling of additional wells in a 640-acre unit, where the permitted number of additional wells, at the time of the hearing in this case, had not been drilled. This was in Section 26–22N–8W. The initial well drilled in said section was an oil well, and Harper obtained permission to drill three more wells in the 640-acre unit on the theory that three more oil wells would result. The additional second well was a gas well. The two additional wells authorized were not drilled because it appeared that these would also be gas wells and therefore would not be necessary to drain the unit. Further, Appellees in their application did not request that Section 26 be de-spaced, although the evidence reflects that it is part of the same common course of supply. Thus, the sole instance of failure to drill additional wells applied for occurred in a 640-acre unit not covered by the application in this cause.

Fourthly, I am in agreement with Appellants' position that both in the hearings below and in this appeal that Appellee's application for de-spacing was defective because it failed to de-space the entire common source of supply. Appellants' position in this regard was based upon 52 O.S.Supp. 1978, § 87.1(a), which provides in pertinent part that the Commission:

"had the power to establish well spacing and drilling units of specified and approximately uniform size and shape covering any common source of supply, or perspective common source of supply, of oil or gas within the State of Oklahoma; ... or may establish, reestablish, or reform well spacing and drilling units of different sizes and shapes when the Commission determines that a common source of

supply contains predominantly oil underlying an area or areas and contains predominantly gas underlying a different area or areas; provided further that the units in the predominantly oil area or areas shall be of approximately uniform size and shape, and the units in the predominantly gas area or areas shall be of approximately uniform size and shape, except that the units in the gas area or areas may be of nonuniform size and shape when they adjoin the units in the oil area or areas; ..."

The record discloses that Appellees requested the Commission to establish smaller drilling and spacing units in only a portion of the subject common source of supply. Dismissals of various units occurred during the course of the proceeding. Relief requested by the Appellees was clearly contrary to the provisions of Section 87.1(a) unless all the common source of supply was involved, or unless there is a combination reservoir when the gas units and oil units are separately defined. The order appealed did not establish separate gas units and separate oil units.

Throughout the hearing and on appeal, Appellants urged an alternative position. They urged that the proper remedy in this case was additional well authorization. Additional well authorization is an alternative to respacing and is provided for in Section 87.1(a) as follows:

"... Provided that the Commission may authorize the drilling of an additional well or wells on *any* spacing and drilling unit or units or any portion or portions thereof, *or* may establish, re-establish, or reform well spacing and drilling units...." (Emphasis added)

Thus, the statute *permits* additional well authorization in *less* than all of the units in a common source of supply, but *requires* all of the common source of supply to be involved in respacing.

The Majority Opinion is mistaken in its contention that Appellants urged a unit-by-unit consideration of the application for purposes of de-spacing, as well as for the

purposes of additional well authorization (increased density). Because of this mistaken assumption, the Majority states that: "It is inappropriate to now allow reversal of the Commission's order on grounds which directly conflict with the parties' position below." Although Appellants never requested de-spacing, it was their contention that if de-spacing was undertaken, it would have to encompass the entire common source of supply. What Appellants did request was increased density which of necessity would be on a unit-by-unit basis.

Since 52 O.S.Supp.1978, § 87.1(a), requires all of the common source of supply to be involved in de-spacing, the Commission's order is defective, and the order's failure to deal with the entire common source of supply is another reason for its reversal by this Court.

Lastly, although I do not disagree with the Majority's holding that the Commission lacked personal jurisdiction over Union Oil of California, I disagree with the consequential results reached by the Majority when they conclude that no part of the Corporation Commission's order "is valid insofar as it affects the rights and interests of Union Oil of California, and is reversed insofar as it attempts to adjudicate the rights of Union Oil of California." The result of the Majority Opinion is to effectively change each 640-acre drilling and spacing unit in which Union has an interest into four 160-acre drilling and spacing units *as to every one of the 640-acre units except Union.* The effects and consequences are chaotic, leaving undetermined and uncertain the rights and liabilities of the parties in each such 160-acre unit as against Union, whose interest is still fixed on the basis of a 640-acre unit. Even if Union's interest is de minimus, the consequences are the same. For example, if Union owns an overriding royalty interest covering only one non-producing 160-acre unit, does the lessee on whose leasehold the former 640-acre unit well was located still have to continue to account to Union on the basis of a 640-acre unit? If Union owns a lease covering only one non-producing 160-acre unit, how can it terminate as to the lessor-royalty owners where the primary term has expired, but not terminate as to Union's lessee interest because the lease was within the former producing 640-acre unit? These disruptive consequences are yet another reason why the Commission's order cannot stand and should be reversed.

I am authorized to state that Justice HODGES and Justice SIMMS join me in this dissent.